**UNITED STATES of America,
Plaintiff–Appellee,**

v.

**Tommy L. RUTLEDGE, Shelly Henson, and Richard Hagemaster, Defendants–Appellants.**

**Nos. 93–1122, 93–2652 and 93–2653.**

United States Court of Appeals, Seventh Circuit.

Argued Sept. 9, 1994.

Decided Nov. 10, 1994.

Rehearing and Suggestion for Rehearing En Banc Denied Jan. 3, 1995 in No. 93–1122.

K. Tate Chambers, Asst. U.S. Atty. (argued), Peoria, IL, for U.S.

Julia M. Gentile (argued), E.P.A., Springfield, IL, for Tommy L. Rutledge.

Spencer L. Daniels (argued), Peoria, IL, for Shelly Henson.

Jeffrey W. DeJoode (argued), March & McMillan, Macomb, IL, for Richard Hagemaster.

Before BAUER and FLAUM, Circuit Judges, and FOREMAN,* District Judge.

BAUER, Circuit Judge.

A jury convicted Tommy Lee Rutledge, Shelly Henson, Richard Hagemaster, and Stan Winters of conspiring to distribute cocaine in violation of 21 U.S.C. § 846. Additionally, the jury convicted Rutledge of conducting a continuing criminal enterprise in violation of 21 U.S.C. § 848, distribution of cocaine in violation of 21 U.S.C. § 841(a)(1), possession of a firearm by a felon in violation of 18 U.S.C. § 922(g), and using or carrying a firearm during the commission of a drug felony in violation of 18 U.S.C. § 924(c). Rutledge, Henson, and Hagemaster appealed citing a surfeit of defects in their collective prosecution. Because we find no merit to their arguments, we affirm.

## I. Facts

In November 1986, after his release from prison, Rutledge began dealing cocaine, a formative step that would soon develop into an extensive drug distribution network. From his base in Chicago, Rutledge would travel every two weeks to Astoria, Illinois to deliver up to two ounces of cocaine to Roger Malott. Soon thereafter, Rutledge moved to Youngstown, Illinois and put Malott to work for him, delivering cocaine and collecting debts resulting from drug sales. Rutledge's initial source of cocaine was Juan Gonzalez of Burlington, Iowa, an acquaintance of Rutledge's from prison and a member of the Latin Kings street gang based in Chicago.

Over the next several months, Rutledge convinced several people to join his enterprise, including Shelly Henson, Richard Hagemaster, Rick Bolen, Randy Mustread, Kim Mummert, Tom Crowe, and Stan Winters. At one point, to demonstrate to Bolen that he was a major drug dealer and to convince him to join his outfit, Rutledge showed Bolen fifty pounds of marijuana and one-eighth of a pound of cocaine stored in the trunk of his car.

Rutledge's methods of doing business were in many ways similar to those of his peers in the drug business. Firearms figured prominently in Rutledge's enterprise. Not only did he maintain a cache of weaponry to protect himself, his employees, and his inventory of drugs, Rutledge also trafficked in firearms. He was more than happy to trade firearms for cocaine and receive firearms in payment for cocaine shipments.

As if the constant presence of firearms was not enough, Rutledge used his connections with the Latin Kings (presumably forged during one of his stints in prison) to maintain control over his operation. He frequently invoked the name of the Latin Kings to intimidate employees and customers alike. Rutledge, however, reserved his most ominous invocation of the Latin Kings for his employees to ensure that no employee would implicate him in this drug enterprise. We will expand on Rutledge's use of this tactic shortly.

At some point during the course of his cocaine conspiracy, Rutledge changed the source of his cocaine; he began to buy cocaine from Roberto Laurel, a member of the Latin Kings in Chicago. Consistent with his *modus operandi*, Rutledge also traded arms with Laurel. To execute his transactions with Laurel, Rutledge would travel with, or send to Chicago in varying combinations, Malott, Mustread, Henson, and Mummert.

From November 1988 through July 1989, Rutledge's base of operations was a trailer he shared with Mummert, Henson, and Hagemaster in Youngstown. Rutledge supported these three and provided them with cocaine. At this time, Rutledge employed Malott and Crowe in addition to his roommates. Henson, however, moved out of the trailer in July 1989 and terminated her association with Rutledge.

Henson's departure was likely hastened when Rutledge was arrested in the trailer in July 1989 by the Illinois State Police on the basis of statements made by Malott that Rutledge was involved with drugs and guns. The arresting officers discovered Rutledge's

---

* The Honorable James L. Foreman, of the United States District Court for the Southern District of Illinois, is sitting by designation.

cache of weapons, but apparently found no drugs. When he learned of Malott's statement to the police, Rutledge threatened Malott with serious harm if Malott testified against him in court. Rutledge made similar threats to Mummert. Rutledge's intimidation succeeded; both Malott and Mummert testified before a state grand jury that Rutledge was not involved with drugs or guns. Rutledge was subsequently released.

Rutledge continued his drug operation until he was arrested by federal authorities in December 1990. Rutledge, Henson, Hagemaster, and Winters were indicted in February 1991. Malott, Mummert, Mustread, and a frequent customer of Rutledge's, Michael Wright, cooperated with the government and testified as to their experiences with Rutledge and his drug ring.

## II. Analysis

### A. Tommy Lee Rutledge

█ Rutledge's first argument is that he was denied a fair trial because two or three jurors encountered Rutledge in handcuffs outside the courtroom during the course of the trial. He contends that the trial court should have *voir dire*'d those jurors to determine whether Rutledge was prejudiced by this incident. As we shall explain, Rutledge received a trial as fair as possible given his own conduct, and the trial court handled the situation perfectly.

On the first afternoon of the trial, Rutledge made a statement to the Deputy United States Marshals to the effect of "what if I take off now?"[1] While the deputies believed that Rutledge was not serious in his threat, they discussed the situation and decided that Rutledge must be handcuffed going to and from the courtroom. On the morning of the second day of the trial, the prosecutor brought this incident to the attention of the trial judge, who approved handcuffing Rutledge.

To ensure that no jurors saw Rutledge being taken out of the courtroom in handcuffs, the deputies adopted certain procedures for bringing Rutledge in and out of the courtroom. Prior to taking Rutledge out of the courtroom, one deputy would check the outer hallway to ascertain whether any jurors were present. If the hallway was clear, the deputies would then lead Rutledge out of the courtroom into that outer hallway. Unfortunately, these measures were not foolproof.

At one point during the trial, two or three jurors briefly saw Rutledge in handcuffs. The deputies followed the procedures they had adopted for Rutledge, but the jurors entered the hallway just after it was checked. It is unclear whether at first glance the jurors necessarily knew that Rutledge was handcuffed; just to make sure that none of the jurors missed it, Rutledge raised his handcuffed hands in an exaggerated manner to show the jurors his handcuffs. Rutledge was immediately led away so that no additional jurors were treated to a similar demonstration.

The parties immediately brought this incident to the attention of the trial judge. The trial judge then offered to give the jury a cautioning instruction regarding the incident. He continued:

> What I would suggest is that I simply make a statement to the jury that it has come to my attention that some of the jurors may have become aware of the fact that he is in custody and that's a reality in this case and I will caution them that the fact that he is in custody should not in any way be considered by them as any evidence or suggestion of guilt. Is that how you want to handle it or would you suggest something else?

After conferring with his client, Rutledge's counsel stated: "We would like to just skip it, your Honor."

Rutledge claims that such a sighting by jurors of a defendant in handcuffs is inherently prejudicial. Therefore, he argues that a curative instruction from the trial judge is obviously insufficient and that, in this case, the trial judge, *sua sponte*, should have *voir dire*'d the jurors in question. Rutledge did not request such a *voir dire* from the judge

---

1. Deputy Kevin Jackson reported that he did not recall exactly what Rutledge had said but that it was a statement similar to "what if I take off now?" or "what if I flee?"

at the time it happened. We believe this omission combined with Rutledge's failure to present any evidence from which we might find that he suffered actual prejudice resulting from this incident demonstrates that this argument lacks merit.

■■■ While we believe that this may be the first time that we have been squarely presented with this issue, we recently noted that "[c]ourts have generally found inadvertent sightings of shackles by the jury to be insufficient to demonstrate prejudice." *Woods v. Thieret,* 5 F.3d 244, 248 n. 5 (7th Cir.1993) (citing *Harrell v. Israel,* 672 F.2d 632, 637 (7th Cir.1982) (citations omitted)). We therefore categorically reject Rutledge's argument that prejudice automatically inheres in a trial when a juror inadvertently sees a defendant in handcuffs. Our position is in accord with other circuits that have addressed this issue. *See, e.g., United States v. Ware,* 897 F.2d 1538, 1542 (10th Cir.), *cert. denied,* 496 U.S. 930, 110 S.Ct. 2629, 110 L.Ed.2d 649 (1990); *United States v. Garcia–Rosa,* 876 F.2d 209, 236 (1st Cir.1989); *United States v. Halliburton,* 870 F.2d 557, 561 (9th Cir.), *cert. denied,* 492 U.S. 910, 109 S.Ct. 3227, 106 L.Ed.2d 575 (1989). In situations such as this one, we hold that the defendant bears the burden of proving that he has suffered actual prejudice. *See, e.g., Garcia–Rosa,* 876 F.2d at 236. Here, neither Rutledge nor the record indicate that Rutledge has suffered actual prejudice.

The trial judge, in the best position to evaluate such things, stated on the record that he believed that Rutledge suffered no prejudice. In addition, the trial judge not only offered a curative instruction, but specifically asked Rutledge's counsel what she wanted done. In a decision that was likely well-informed by her trial experience and reached after consultation with her client, Rutledge's counsel decided that dwelling on the incident was unwise. Her failure to request the *voir dire* at this time supports our belief that Rutledge's encounter with the jurors had no effect on his trial and that this encounter could only have prejudiced him if the jurors had been browbeaten about it.

The task of trying cases is one of dizzying pace and fraught with unexpected twists and turns. All parties to this trial (save Rutledge himself) surely sought to prevent the very incident that happened in this case, but it happened nevertheless. The trial judge acted swiftly and offered Rutledge the remedy of his choice. If Rutledge's counsel had been hell-bent on *voir dire* 'ing the jurors, she had ample opportunity to request that of the trial judge. Rutledge and his counsel thought it best to put the incident behind them and move on; the trial judge agreed. We believe Rutledge suffered no prejudice, that the trial judge and Rutledge's counsel recognized that there was no prejudice, and that the trial judge handled this incident properly.[2]

■ Rutledge next complains of the admission of certain testimony by Malott linking Rutledge with the Latin Kings. He claims that this testimony was offered to inflame the jury, that its prejudicial effect greatly outweighed its probative value, and that it should have been excluded, apparently pursuant to Federal Rule of Evidence 403. We disagree.

Malott testified that after Rutledge was arrested in July 1989, he cooperated with agents from the Illinois State Police by giving them a statement concerning Rutledge's drug operation. Later, Malott discovered that Rutledge had obtained a copy of Malott's statement upon his release from prison. Rutledge then contacted Malott by telephone to inform Malott that Rutledge had a bullet with Malott's name on it. The two men met, and Rutledge showed Malott his copy of Malott's statement. Rutledge then waived a handgun at Malott and said:

> We're going to have to get this straightened out. You know, I can have the Latin Kings down here in two hours to take care of this. I'm not going to jail for twenty years over your lying, making these kind of statements.

---

2. Because Rutledge suffered no prejudice from the jurors' inadvertent sighting of him in handcuffs, we refrain from discussing Rutledge's role in creating whatever effect there may have been on his trial. Suffice it to say that defendants are well-advised to act as diligently as the court personnel in avoiding this type of incident.

One week after Rutledge threatened Malott, Malott discovered a copy of his statement affixed to the side window of his truck; the letters "LK" were spray-painted in red on the statement. Two days later, three Hispanic men, believed by Malott to be members of the Latin Kings, drove their car into the driveway of Malott's home. Malott scared them off by brandishing a shotgun.

Rutledge's threats were enough to cause Malott to perjure himself before the state grand jury by denying that Rutledge operated a drug ring. At trial, the government offered Malott as one of its principal witnesses against Rutledge and the others. The government offered Malott's testimony describing Rutledge's threats, which necessarily invoked Rutledge's gang affiliation, to meet what it expected to be vigorous attempts to impeach Malott on the basis of his prior inconsistent statements before the state grand jury. Over objections, the trial judge allowed Malott to testify to Rutledge's threats. As expected, counsel for each defendant extensively cross-examined Malott about his previous perjury.

■ Rule 403 operates to exclude otherwise relevant evidence only if its probative value is substantially outweighed by its potential to create unfair prejudice to the defendant. In this instance, the trial court determined that Malott's testimony regarding Rutledge's threats should not be excluded. We review the trial court's decision to admit evidence for an abuse of that court's discretion. *See, e.g., United States v. Williams*, 31 F.3d 522, 527 (7th Cir.1994). It is clear to us that the district court did not abuse its discretion in admitting this aspect of Malott's testimony.

Naturally, the vast majority of the government's evidence against a defendant is prejudicial to him. That's the idea. But in order to find that a particular piece of evidence must be excluded pursuant to Rule 403, its probative value must be insignificant compared to its inflammatory nature so that the evidence unfairly prejudices the defendant. That is not the case here. The government had a right to rehabilitate Malott as a witness by explaining his prior perjury; to do so, Malott was required to recount the reasons that he had perjured himself. Rutledge does not deny that Malott's testimony is true, he simply claims that his testimony is too prejudicial.

Rutledge seems to argue that simply connecting a defendant with a gang constitutes unfair prejudice that substantially outweighs any probative value. We have approved, however, the admissibility of evidence of gang affiliation in a number of cases for a number of purposes. *See, e.g., United States v. Rodriguez*, 925 F.2d 1049, 1053 (7th Cir. 1991); *United States v. Lewis*, 910 F.2d 1367, 1372 (7th Cir.1990) (collecting cases). More specifically, we have permitted its admissibility to explain a witness's prior inconsistent statement made out of fear of gang retaliation. *United States ex rel. Garcia v. Lane*, 698 F.2d 900, 902 (7th Cir.1983). Malott's testimony regarding Rutledge's threats was highly probative evidence explaining Malott's prior inconsistent statement, and the trial court did not abuse its discretion in admitting it.

■ Rutledge's third argument is that because Rick Bolen did not testify at trial or at the sentencing hearing all statements attributed to him in the presentence report should have been omitted. He claims that because he was unable to cross-examine Bolen, Bolen's statements do not have the requisite indicia of reliability. Rutledge misperceives the reliability requirement.

At the sentencing hearing, Rutledge objected to the district court's consideration of Bolen's statements in the presentence report. Bolen's statements told of the incident in which Rutledge showed Bolen the marijuana and cocaine in the trunk of Rutledge's car and of other occasions on which Bolen accompanied Rutledge to Iowa to deliver or obtain cocaine. To establish Bolen's reliability, the government called the case agent, Bruce Harmening. Harmening testified that he had compared the statements in the presentence report given by Bolen with the statements and trial testimony of other witnesses and with the physical evidence and found no significant inconsistencies. He testified that there were some minor inconsistencies, such as a variance of a few days with respect to

dates of excursions to obtain drugs and slight differences in estimations as to the amount of cocaine Rutledge sold weekly. The district court found Harmening's testimony sufficient to support the probation officer's position in the presentence report.

The court then informed Rutledge that in order to challenge Bolen's statements, he must present evidence in addition to a simple denial demonstrating that Bolen's statements were not true. Rutledge discussed with his counsel whether to present any such evidence during a brief recess. They then informed the court that they would not present any evidence.

The district court conducted this aspect of Rutledge's sentencing hearing precisely in accordance with the controlling case in this circuit, *United States v. Coonce*, 961 F.2d 1268 (7th Cir.1992). In *Coonce*, we articulated the proper procedure for contesting facts upon which a district court relies to sentence a defendant. We stated:

> First, the defendant must challenge the facts in the presentence report ... as being unreliable or incorrect. Having done so, and assuming the facts as presented bear sufficient indicia of reliability, the defendant must carry the burden of presenting some evidence beyond a mere denial calling the reliability or correctness of the alleged facts into question. If the defendant meets this burden of production, the burden of persuasion then shifts back to the prosecution, who in turn must convince the court that the facts presented by the government are actually true.

*Id.* at 1280. Rutledge contends that the facts he has called into question, Bolen's statements, do not bear an indicia of reliability sufficient to trigger his burden of production under *Coonce*. He claims that Bolen's statements are simply naked assertions; as a result, he asserts that *Coonce* permits a mere denial to render them inapplicable in sentencing.

As an initial matter, Bolen's statements are not simply naked assertions. Plenty of other witnesses intimately involved in Rutledge's operation testified about his drugs and guns; that Bolen's statements are consistent with these other accounts indicates that they are based in fact. *See United States v. Westbrook*, 986 F.2d 180 (7th Cir. 1993). In addition, this consistency coupled with Harmening's testimony adequately support the district court's finding that Bolen's statements bear a sufficient indicia of reliability. Rutledge's challenge to these statements, therefore, fails.

■■■ Rutledge's fourth and final argument is that his Fifth Amendment rights have been violated because he was convicted and sentenced for operating a continuing criminal enterprise and for conspiracy to distribute cocaine. The Double Jeopardy Clause of the Fifth Amendment protects defendants from being tried and punished for the same offense twice. While the conspiracy charge is a lesser included offense of the CCE charge, double jeopardy is not implicated as long as district court does not impose cumulative sentences for the crimes. *United States v. Bond*, 847 F.2d 1233, 1238 (7th Cir.1988); *see also Jeffers v. United States*, 432 U.S. 137, 157–58, 97 S.Ct. 2207, 2219–20, 53 L.Ed.2d 168 (1977). This is because:

> [O]ne can *both* conspire (agree to run a drug business) and run a continuing criminal enterprise (strike the agreement and succeed).... The statutes reach the same group of persons. It is not illogical to convict a person of both agreeing to do something (§ 846) and succeeding on a grand scale (§ 848).

*Bond*, 847 F.2d at 1238. Concurrent sentences may be imposed for conspiracy and CCE provided the cumulative punishment does not exceed the maximum under the CCE act. *United States v. Bafia*, 949 F.2d 1465, 1473 (7th Cir.1991); *Bond*, 847 F.2d at 1239.

■■■ In this case, the district court sentenced Rutledge to life imprisonment on his CCE conviction and life imprisonment on the conspiracy conviction to run concurrently with the CCE sentence. The maximum penalty under the CCE act at the time of Rutledge's sentencing was life imprisonment. Thus, by imposing concurrent sentences, the district court did not impose a cumulative penalty, and Rutledge's sentence is proper.

## B. *Shelly Henson*

■ Henson's first argument is that the government's evidence against her is insufficient to support her conviction. In her brief, she went so far as to say: "Clearly, there was no specific evidence as to Shelly Henson's role in regard to said conspiracy." We disagree; the government presented evidence that overwhelmingly supports Henson's conviction.

■ In reviewing Henson's claim, we must review the evidence in a light most favorable to the government, drawing all reasonable inferences. Then, we must ascertain whether any rational trier of fact could have found the essential elements of the crime beyond a reasonable doubt.

The government's evidence featured testimony from several witnesses intimately involved in Rutledge's drug conspiracy. Kim Mummert testified that Henson obtained cocaine for Rutledge, sold drugs that she received from Rutledge while living with him in the trailer, and helped pay the bills with money she earned selling Rutledge's drugs. Randy Mustread testified that Henson sold cocaine for Rutledge, delivered cocaine for him, and collected payment. Roger Malott testified that Henson cut cocaine for Rutledge, delivered cocaine for him, and collected payment. Malott also testified that Henson kept Rutledge's accounts regarding drug transactions. Michael Wright testified that Henson arranged cocaine sales for Rutledge and collected payments. The government's evidence easily supports Henson's conviction.

■ Henson next argues that the district court abused its discretion by admitting evidence of a pistol she had in her possession. Although the district court provided the jury with several instructions regarding the limited purposes for which they could consider this evidence, Henson maintains that the jury was unable to follow these instructions. The district court properly admitted this evidence.

The gun was obtained by authorities from Henson when she and Wright were arrested in early 1989 in possession of one ounce of cocaine. The .25 caliber semi-automatic handgun and ammunition were found in Henson's purse. The police also found in Henson's purse Western Union money transfers which represented payment for drugs that Rutledge purchased from Randy Mustread.

The gun was introduced by Illinois State Police Special Agent Bruce Kettlekamp, who testified that he had discovered the gun in Henson's purse during the course of her arrest. Henson's counsel objected to the gun's relevancy, and district court overruled the objection and admitted the testimony for the limited purposes of showing a connection between Rutledge and Henson and for supporting the weapons charges against Rutledge. An ATF agent then testified as to the chain of custody of the gun, at which time the district court again reminded the jury of the limited purposes of the testimony regarding the gun. In addition, Wright, Mustread, and Malott all testified that Henson carried the gun, which was given to her by Rutledge ostensibly for her protection. During the testimony of each of these witnesses, the district court again admonished to consider the testimony for Henson's connection to Rutledge and with respect to Rutledge's gun charge.

It is clear that the district court addressed this situation perfectly. The government properly presented this evidence to demonstrate Henson's role in Rutledge's drug enterprise and to connect Rutledge to the gun. Any potential for prejudice to Henson was snuffed out by the district court's repeated warnings to the jury. And, of course, we presume that jurors do what they are told. *See, e.g., United States v. Scott,* 19 F.3d 1238, 1244 (7th Cir.1994) (citations omitted). The district court therefore properly admitted the evidence of the gun.

■ Henson's next argument centers on a statement made by a prosecutor during closing argument. At that time, one of the prosecutors commented on the credibility of a defense witness. The prosecutor commented that this witness claimed that she saw Roger Malott near her home during the time in which Malott was in custody. The prosecutor then stated that "[t]he defense should have been embarrassed to hear her say that." Henson's counsel immediately ob-

jected, and the district court sustained the objection. The prosecutor went on to state that the witness' testimony was a physical impossibility, to which Henson's counsel did not object. Henson argues that the prosecutor's statement was so prejudicial to her that she requires a new trial.

We evaluate the prosecutor's comments to determine whether they were improper. *United States v. Neely,* 980 F.2d 1074, 1084–85 (7th Cir.1992). If so, a new trial is warranted only if "the prosecutor's comments infected the trial with unfairness as to make the resulting conviction a denial of due process." *Darden v. Wainwright,* 477 U.S. 168, 181, 106 S.Ct. 2464, 2471, 91 L.Ed.2d 144 (1986) (citation omitted). The prosecutor's comments in this case, while improper, do not remotely rise to the level of a due process violation. They were directed at a witness for another defendant and did not bear at all on the evidence presented against Henson. Also, the judge quickly granted Henson's counsel's objection, and Henson's counsel had ample opportunity to counter the prosecutor's comments during the course of her argument. Finally, the evidence was so overwhelmingly against Henson on the conspiracy charge on which she was convicted that this minor transgression did not affect her guilty verdict at all.

Henson's last argument, also advanced by Richard Hagemaster, is that the district court erred in giving the government's multiple conspiracy instruction rather than one she preferred. Henson claimed that she was not involved in Rutledge's cocaine conspiracy, but in different conspiracies for which she was not prosecuted; she preferred a detailed instruction that she believed was necessary to present her defense. Notwithstanding the overwhelming evidence of her participation in Rutledge's cocaine operation, the district court, who admitted doubt of its necessity, gave the government's multiple conspiracy instruction. Again, the district court made the proper decision.

In reviewing the fitness of jury instructions to which objections were properly raised in the proceedings below, "we must determine from looking at the charge as a whole, 'whether the jury was misled in any way and whether it had understanding of the issues and its duty to determine those issues.'" *United States v. Boykins,* 9 F.3d 1278, 1285 (7th Cir.1993) (quoting *Trustees of Indiana Univ. v. Aetna Casualty and Sur. Co.,* 920 F.2d 429, 437 (7th Cir.1990)). A defendant is not entitled to have a particular instruction presented to the jury, but only to have her theory of the defense presented. *United States v. Boucher,* 796 F.2d 972, 976 (7th Cir.1986). In these matters, the district court is given substantial discretion with respect to the specific wording of the instruction. *United States v. Penson,* 896 F.2d 1087, 1090 (7th Cir.1990).

The instruction tendered by the government and given by the district court informed the jury that if it should find that a particular defendant did not join the conspiracy that was charged in the indictment, it must find the defendant not guilty of conspiracy. This is the very instruction of which we approved in similar circumstances in *Penson,* 896 F.2d at 1091. Since we are not sure that a multiple conspiracy instruction is even warranted in this case, we agree with the district court that government's tendered instruction "is all any defendant could legitimately ask for in relation to this type of instruction." Henson and Hagemaster were not prejudiced by the district court's failure to give their preferred multiple conspiracy instruction.

## C. Richard Hagemaster

Hagemaster's principal argument is that the district court erred in admitting Michael Wright's in-court identification of Hagemaster. He claims that Wright's identification is unreliable and therefore constitutes a denial of his Fifth Amendment Due Process rights. This argument is without merit.

During the course of the trial, Wright described a particular drug transaction that transpired in 1988 in which he gave money to Henson to deliver to Rutledge in exchange for an ounce of cocaine. Wright testified that he had waited several hours and after calling Rutledge twice to remind him of his order, Rutledge assured Wright that the courier was on his way. Wright continued:

Forty-five minutes to an hour later, a car pulled up in the driveway, an old VW bug with no fenders on the rear end, and a tall, skinny guy got out wearing a fatigue jacket, pearl earring in his ear. Like I say, a very slender person. Crowe let him in. He introduced me to—I believe his name was—his name was Rick at the time. And we sat there and talked and, anyway, this guy, this Rick or the guy that had brought the dope, he threw it out on the coffee table and he said, "This is what it is." Wright testified that he was displeased with the quality of the cocaine and that Hagemaster must have realized Wright's displeasure by the expression on his face because Hagemaster informed Wright that if the cocaine was unacceptable, Rutledge would return Wright's money. Wright then identified Hagemaster, in court and seated at the defense table, as the cocaine courier.

On cross-examination, Hagemaster's counsel pressed Wright for more details of the transaction. Wright happily obliged. Wright described Hagemaster's clothing again and testified that Hagemaster sat for thirty minutes in his living room where there were three or four lamps providing light. Wright also testified that he had seen Hagemaster on another occasion at Rutledge's trailer when Wright was there to obtain cocaine.

Wright also testified that he had originally described Hagemaster to investigating agents in 1990. Also, in a subsequent meeting with them, the agents showed Wright a single photograph and asked him whether he recognized the person in the photograph. The person in the photograph was Richard Hagemaster, although the agents did not so identify him to Wright. It is the presentation of the single photograph of Hagemaster to Wright that Hagemaster claims was so suggestive as to render Wright's in-court identification of Hagemaster unreliable.

█ The admissibility of a challenged in-court identification is governed by a two-part test. First, we must determine whether the initial out-of-court identification was unduly suggestive; here, the presentation of the single photograph of Hagemaster. If so, the in-court identification is inadmissible unless it is

so reliable, in view of the totality of the circumstances, as to prevent a substantial likelihood of misidentification. *Manson v. Brathwaite,* 432 U.S. 98, 107–14, 97 S.Ct. 2243, 2249–53, 53 L.Ed.2d 140 (1977). The district court determined that the presentation of the single photograph of Hagemaster to Wright was unduly suggestive, and we do not disagree. But we also agree with the district court that Wright's in-court identification of Hagemaster was sufficiently reliable that it withstands Hagemaster's due process challenge.

█ Our inquiry into the reliability of Wright's in-court identification of Hagemaster is guided by several factors: the opportunity of the witness to view the criminal at the time of the crime, the witness' degree of attention, the accuracy of his prior description of the criminal, the level of certainty demonstrated at the confrontation, and the time of the crime and the confrontation. *United States v. Larkin,* 978 F.2d 964, 970 (7th Cir.1992) (citing *Manson,* 432 U.S. at 114, 97 S.Ct. at 2253). In this case, the totality of the circumstances, within the framework of these factors, demonstrates that Wright's in-court identification was indeed reliable.

Wright testified that he spent thirty minutes with Hagemaster in his well-lighted living room at the time of the crime. This provided Wright with ample opportunity to view Hagemaster. Wright's testimony indicates that he was quite attentive during the commission of the crime. He described Hagemaster's VW bus and his appearance in significant detail. In addition, Wright's belief that Hagemaster could see the displeasure register on Wright's face indicates that the two men were in reasonably close proximity with one another, each capable of noticing the other's features and expressions. And while the lapse of time between the time of the commission of the crime and the trial is not insignificant, Wright's detailed description of Hagemaster and his conviction that the man at the defense table was Hagemaster demonstrate that the identification was reliable. The district court properly admitted Wright's in-court identification of Hage-

master. Hagemaster's other claims are without merit and do not require discussion.

### III. Conclusion

For the foregoing reasons, the convictions of Tommy Lee Rutledge, Shelly Henson, and Richard Hagemaster are

AFFIRMED.