**UNITED STATES of America, Plaintiff,**

**v.**

**Salome VARELA, et al., Defendants.**

**No. 96 CR 407.**

United States District Court,
N.D. Illinois,
Eastern Division.

Sept. 15, 1997.

Ryan Stoll, Jonathan Bunge, U.S. Attys. Office, Chicago, IL, for Plaintiff.

Steven Shobat, Cesar & Shobat, Chicago, IL, for Salome Varela.

Joseph R. Lopez, Joseph R. Lopez, Ltd., Chicago, IL, for Miguel Torres.

Sheldon Bart Nagelberg, Chicago, IL, for Jesus Ruiz.

*OPINION AND ORDER*

NORGLE, District Judge.

Before the court are Defendants' Motions to Suppress Post–Arrest Photographic Identifications and Any Tainted Subsequent In-Court Identifications. For the following reasons, their motions are denied.

## I. BACKGROUND

The indictment in this case charges Defendants, Salome Varela ("Varela"), Miguel Torres ("Torres"), Jesus Ruiz–Sanchez ("Ruiz"), Jose De La Paz Sanchez ("Sanchez"), and Luis Alberto Carreno ("Carreno"), who is presently a fugitive (collectively "the captors"), with various federal offenses. (Gov't *Santiago* Proffer at 2.) The Government states that its evidence at trial will show that the captors were "enforcers" for drug-traffickers. *Id.* The captors kidnapped four individuals who allegedly owed, or was related to someone who owed, debts arising from cocaine trafficking. *Id.*

The Government states that three of the victims, "Victims A, B, and C," will testify at trial and will describe their kidnappings. The fourth victim, Jaime Estrada ("Estrada"), was shot in the stomach; he later died from his gunshot wound and lack of timely medical treatment. The family members from whom the captors allegedly demanded ransom money will also testify at trial. *Id.*

Victim A will allegedly testify as follows. *Id.* at 7. Sometime in May of 1996, two Mexican individuals, who have not been indicted, asked Victim A to assist them in locating another Mexican individual, Mauricio Garza, also known as "Victor." *Id.* The two Mexican individuals told Victim A, who distributed cocaine on behalf of Victor, that Victor owed them $100,000 for cocaine; they also told Victim A that he would be held accountable if he did not locate Victor. *Id.*

On June 15, 1996, after failing to locate Victor, the two Mexican individuals led Victim A to a blue and white van. *Id.* Two men from the van then forced Victim A into the van. *Id.* Once inside the van, Victim A saw a third individual. *Id.* Victim A has identified Torres, Ruiz, and Sanchez as the three men inside the van. *Id.* Torres, Ruiz, and San-

chez then took Victim A to the basement of a house, which Victim A will identify as the "Newland House," and restrained him with duct-tape to a support pole. *Id.* at 8.

During his captivity, Torres, Ruiz, Sanchez, or Victim A at the captors' direction, made several phone calls to Victim A's brother, sister, and wife, in order to collect some ransom money. *Id.* Victim A's wife first delivered two cars with the appropriate papers as ransom payments. *Id.* at 9. The captors were not satisfied; thus, Victim A's wife delivered another car. *Id.* After picking up the cars, the captors complained about the value of the cars and beat up Victim A. *Id.* at 10.

On what Victim A understood to be June 29, 1996, Sanchez called Victim A's wife in Victim A's presence. *Id.* at 11. At that time, Victim A's wife informed Sanchez that the Federal Bureau of Investigation ("FBI") had been to her home and asked her some questions. *Id.* Thereafter, Victim A freed one of his hands from the duct-tape restraint and escaped from the Newland House through a side door. *Id.*

Victim B will allegedly testify as follows. *Id.* at 12. On June 21, 1996, five young Mexican individuals kidnapped him in front of his home. *Id.* After they forced Victim B into a blue and white van, they told him to lie face down and not to look in any direction or say anything. *Id.* Victim B has identified Varela, Torres, and Ruiz as three of the five men inside the van. *Id.* Victim B will also identify the van as the same blue and white van that Victim A identified. *Id.*

Following his abduction, the captors took Victim B to the basement of a house, which Victim B will identify as the "Newland House." *Id.* Victim B saw another individual in the basement who was restrained with duct-tape; Victim B will identify Victim A as that individual. *Id.* The captors then restrained Victim B with duct-tape and informed him that they kidnapped him because his son owed them $20,000 for a kilogram of cocaine. *Id.*

During Victim B's captivity, the captors directed him at gunpoint to stand against a wall so that they could photograph him with a video-camera. *Id.* at 13. The captors also questioned Victim B on several occasions regarding his family's ability to pay ransom for his release, and called, or directed Victim B to call, his wife for ransom money. *Id.* at 14.

Victim C will allegedly testify as follows. *Id.* at 15. In 1995, Victim C distributed cocaine to various individuals. *Id.* A Mexican individual, known to Victim C as Tony, supplied Victim C with multiple kilograms of cocaine. *Id.* Victim C owed Tony $130,000 for cocaine because Victim C's customers did not pay him. *Id.*

On June 22, 1996, Tony went to Victim C's home to discuss Victim C's debt. *Id.* While the two were walking outside Victim C's home, a blue and white van pulled up. *Id.* Tony ordered Victim C to go with the men inside the van and stated that he would be required to repay his debt. *Id.* Once inside the van, Victim C saw four or five Mexican individuals. *Id.* The captors directed him to lie face down and not to look around or say anything. *Id.* at 16. Victim C has identified Varela, Torres, Ruiz, and Carreno as the men inside the van. *Id.*

The captors took Victim C to the basement of a house, which Victim C will identify as the Newland House. *Id.* As Victim C entered the basement, he saw two individuals restrained with duct-tape; Victim C will identify these individuals as Victims A and B. *Id.* Victim C was similarly restrained. *Id.* Afterwards, the captors directed Victim C at gunpoint to stand against a wall so that they could photograph him with a video-camera. During his captivity, the captors directed Victim C to call his ex-wife for ransom money. *Id.* at 16–17.

On June 29, 1996, the FBI arrested Varela, Torres, and Ruiz. *Id.* at 18. The FBI were investigating the kidnapping of Estrada and surveilling a ransom delivery in that case; Varela, Torres, and Ruiz arrived to pick up the ransom delivery. *Id.*

On June 30, 1996, Victims B and C overheard the remaining captors discuss the arrests and the need to relocate Victims B and C. *Id.* at 14–15, 17.. The captors then directed Victims B and C out of the Newland House at gunpoint. *Id.* at 14–15. Once outside, Victims B and C ran from their captors

when they saw a neighbor appear on the porch next door. *Id.*

Thereafter, the neighbor called the Chicago Police; officers arrived on the scene and took Victims B and C to the Area Five police station for questioning. (Gov't Resp. at 17.) Following the standard kidnapping procedure, the Area Five officers advised the FBI of the incident. *Id.* at 18. Special Agents Sharon Slattery and Kevin Cassiday of the FBI arrived at Area Five and participated during Victims B and C's interviews. *Id.* Although Agents Slattery and Cassiday were also investigating the Estrada case, neither had any reason to believe that the Estrada case was in any way related to the kidnappings of Victims B and C. *Id.*

Area Five officers, along with Agents Slattery and Cassiday, separately interviewed Victims B and C. Victims B and C independently stated that they were kidnapped by five young, Mexican individuals, and that they were abducted in a blue and white van. *Id.* at 19. Agent Cassiday will allegedly testify that he decided to show a laser sheet of Polaroid photographs of Varela, Torres, and Ruiz, and the victim, Estrada, to Victims B and C after their interviews. *Id.* at 18–19. The laser sheet depicts profile-shots of Varela and Torres in front of FBI placards, and head-shots of Ruiz and Estrada. *Id.* at 18.

At that time, Victims B and C were seated on opposite sides of a series of chairs in the Area Five police station. *Id.* at 19. Without informing Victims B and C anything about the persons depicted in the laser sheet, Agent Cassiday showed the laser sheet to Victims B and C separately. He then asked whether they recognized anyone. *Id.* Victims B and C independently identified Varela, Torres, and Ruiz as three of the men involved in their kidnappings; neither victims could see the persons the other was identifying. *Id.*

Consequently, Varela, Torres, and Ruiz (collectively "Defendants") move to suppress their respective out-of-court, photographic identifications and any tainted in-court identifications. Defendants also move for an evidentiary hearing on the issue.

## II. DISCUSSION

### A. Evidentiary Hearing

The Supreme Court in *Watkins v. Sowders,* 449 U.S. 341, 349, 101 S.Ct. 654, 659, 66 L.Ed.2d 549 (1981), opined that the Constitution does not require trial courts to determine the admissibility of identification evidence outside the presence of the jury. The Supreme Court explained that our adversary system of justice assumes that juries can properly evaluate identification evidence and assess the reliability of such evidence. *Id.* at 347, 101 S.Ct. at 658.

Nevertheless, relying on the Seventh Circuit's opinion in *United States v. Rodriguez,* 69 F.3d 136, 141 (7th Cir.1995), Defendants argue that an evidentiary hearing on the issue of identification evidence is required. The Seventh Circuit in *Rodriguez* held that an evidentiary hearing is required if the accused satisfies his burden of showing the necessity of such a hearing. *Id.* "That burden can be met only upon the presentation of 'definite, specific, detailed, and nonconjectural' facts ... that demonstrate that there is a disputed material issue of fact." *Id.* (citations omitted).

Defendants have not presented any "definite, specific, detailed, and nonconjectural facts;" Defendants merely argue that an evidentiary hearing is required so that they can have an opportunity to cross-examine identification witnesses to determine what transpired during the out-of-court, photographic identifications. As the Supreme Court noted in *Watkins,* the Defendants, even without an evidentiary hearing, " ' "can both cross-examine the identification witnesses and argue in summation as to factors causing doubts as to the accuracy of the identification—including reference to both any suggestibility in the identification procedure and any countervailing testimony such as alibi." ' " *Id.* at 348, 101 S.Ct. at 658–59 (citations omitted).

As such, the court declines the opportunity to depart from the presumption that the jury will follow the instructions and properly evaluate the identification evidence. *See Watkins,* 449 U.S. at 347, 101 S.Ct. at 658; *see also United States v. Johnson,* 986 F.2d 1425, 1993 WL 47210, at * 4 (7th Cir. Feb.23, 1993)

(no evidentiary hearing needed to determine whether the identification procedures were impermissibly suggestive as a matter of law).

"Generally speaking, the jury can intelligently weigh the reliability of a questionable identification.... A district court should remove the evidence from the jury's consideration only if the identification is so unreliable that the jury is likely to be misled." *United States v. Bolton*, 977 F.2d 1196, 1201 (7th Cir.1992). Accordingly, the court will apply the well established two-part test to determine whether the out-of-court, photographic identifications in this case are "so unreliable that the jury is likely to be misled." *Id.; see also Neil v. Biggers*, 409 U.S. 188, 198, 93 S.Ct. 375, 381–82, 34 L.Ed.2d 401 (1972); *United States v. Moore*, 115 F.3d 1348, 1360 (7th Cir.1997); *McGowan v. Miller*, 109 F.3d 1168, 1173 (7th Cir.1997); *United States v. Hall*, 109 F.3d 1227, 1237 (7th Cir.1997).

### B. Out-of-Court Identifications

■ "Despite the hazards of initial identification by photograph, this procedure has been used widely and effectively in criminal law enforcement, from the standpoint of both apprehending offenders and of sparing innocent suspects the ignominy of arrest by allowing eyewitnesses to exonerate them through scrutiny of photographs." *Simmons v. United States*, 390 U.S. 377, 384, 88 S.Ct. 967, 971, 19 L.Ed.2d 1247 (1968). Thus, rather than prohibit its employment, courts must engage in a.two-step inquiry to determine the admissibility of out-of-court identification evidence from a photo-array. *See Moore*, 115 F.3d at 1360; *McGowan*, 109 F.3d at 1173; *Hall*, 109 F.3d at 1237.

First, the Defendants bear the burden of establishing that the identification procedure was impermissibly suggestive. *See Moore*, 115 F.3d at 1360; *McGowan*, 109 F.3d at 1173; *Hall*, 109 F.3d at 1237. If the Defendants meet their burden, and the court finds that the procedure was impermissibly suggestive, the court must then analyze the second step: whether, under the totality of the circumstances, the out-of-court, photographic identifications were sufficiently reliable despite the suggestiveness. *See Manson v. Brathwaite*, 432 U.S. 98, 114, 97 S.Ct. 2243, 2253, 53 L.Ed.2d 140 (1977); *Biggers*, 409 U.S. at 199–200, 93 S.Ct. at 382–83; *Hall*, 109 F.3d at 1237–38.

### 1. *Impermissibly Suggestive*

■ Defendants have the burden of showing that the out-of-court, photographic identification procedure was impermissibly suggestive. *See Moore*, 115 F.3d at 1360; *McGowan*, 109 F.3d at 1173; *Hall*, 109 F.3d at 1237. In an attempt to meet their burden, Defendants argue that the identification procedure was suggestive because of the following reasons: (1) the photo-array depicts distant, profile-shots of Varela and Torres, and head-shots of Ruiz and Estrada; (2) Varela and Torres are photographed in front of FBI placards; (3) Defendants' photographs are in color, whereas Estrada's photograph is in black and white; (4) the witnesses were informed that the persons in the photo-array were in custody; and (5) alternative, less suggestive identification procedures were available.

The defendant in *Kubat v. Thieret*, 867 F.2d 351, 356 (7th Cir.1989), presented similar arguments. In *Kubat*, the police initially showed five photographs to three witnesses while they were in the same bar-room. *Id.* The defendant's photograph was a "long-range, full frontal view, showing him standing," while the other four photographs were head-shots. *Id.* In the photo-array, defendant was the only person wearing glasses; witnesses had described the suspect as wearing glasses. *Id.* Thereafter, the police showed the witnesses additional photo-arrays of mug shots with visible arrest dates, including the defendant's photograph. *Id.* Thus, the defendant argued that the photographs were suggestive and that the suggestiveness was unnecessary since he was in custody and could have posed for a non-suggestive photograph. *Id.*

A jury in Illinois state court convicted the defendant in *Kubat* of aggravated kidnapping and murder; the same jury sentenced him to death. *Id.* at 354. On direct appeal, the Illinois Supreme Court affirmed both the conviction and the sentence. *Id.* The defendant then filed a petition for a writ of habeas corpus. *Id.* The district court denied the petition with respect to defendant's conviction, but granted the petition with respect to his sentence. *Id.* On appeal, the defendant challenged his conviction on several grounds,

including the admission of suggestive photographic identification, and unreliable in-court identification. *Id.*

The Seventh Circuit in *Kubat* acknowledged that the "identification procedures employed by the investigative officers could have been handled more carefully." *Id.* at 358. Nevertheless, the Seventh Circuit opined that the record, and an independent review of the challenged arrays, did not establish that the procedure was so suggestive that it violated defendant's due process rights. *Id.* The defendant failed to meet his burden of showing that persons' positions, mug shots with visible arrest dates, or the availability of alternative identification procedures, equate with impermissible suggestiveness, requiring suppression of identification evidence. *Id.*

■ In this case, the Government admits that the out-of-court, photographic identification procedure was less than optimal. However, relying on *Kubat* the Government argues, and the court agrees, that the court's role is not "to mandate optimal procedures ... [but] to protect against constitutional error." *Kubat,* 867 F.2d at 357 (7th Cir. 1989); *see also Simmons,* 390 U.S. at 385, 88 S.Ct. at 971–72 (Supreme Court opined that each case must be considered on its own facts "even though the identification procedure employed may have in some respects fallen short of the ideal."). Therefore, the court must determine whether the photo-array or its presentation is of such nature that the Defendants are singled out as the culpable parties. *See United States v. Funches,* 84 F.3d 249, 253 (7th Cir.1996) ("The differences between the suspects 'would hardly suggest to an identifying witness that [Funches] was more likely to be the culprit."); *McGowan,* 109 F.3d at 1174 ("'cannot say that the appearances of the men depicted are so different from McGowan that his picture is emphasized over any of the others.'").

As in Kubat, the Defendants have failed to meet their burden of showing that the photographic identification procedure was impermissibly suggestive. First, the court notes that all the photographs are of young, Mexican individuals with similar facial features. The fact that the photo-array depicts distant, profile-shots of Varela and Torres, and head-

shots of Ruiz and Estrada, does not necessarily establish that the photo-array is suggestive. Victims B and C independently identified Varela and Torres from a distant, profile-shot, and Ruiz from a head-shot. Thus, it is evident that Victims B and C were not influenced by the positions of the individuals portrayed.

Second, the mere use of photos in which the FBI placards with visible arrest dates does not necessarily establish that the photo array is suggestive. *See Johnson,* 1993 WL 47210, at * 3; *United States v. Donaldson,* 978 F.2d 318, 386 (7th Cir.1992); *Kubat,* 867 F.2d at 358. Notably, Victims B and C identified Ruiz, who was not standing in front of a FBI placard. Thus, it is evident that Victims B and C were not influenced by the presence of FBI placards.

Third, there is no reason to believe that Victims B and C identified Varela, Torres, and Ruiz merely because their photographs were in color. If color photographs are suggestive by its nature, Defendants have failed to offer any evidence to establish that color photographs suggest culpability.

Fourth, Defendants offer no evidence to suggest that Agent Cassiday informed Victims B and C that three of the persons in the photo-array were in custody. It is uncontradicted that Agent Cassiday merely asked Victims B and C separately whether they recognized any individual in the photo-array.

■ Finally, as the court discussed above, the mere fact that a better identification procedure was available does not mean that the identification procedure used was impermissibly suggestive. *See Sumner v. Mata,* 446 U.S. 1302, 1304, 100 S.Ct. 1630, 1631–32, 64 L.Ed.2d 216 (1980); *Simmons,* 390 U.S. at 385, 88 S.Ct. at 971–72; *Kubat,* 867 F.2d at 357.

Nothing about the photo-array indicates that any one of the Defendants' photographs were emphasized from the other ones, much less from the victim's. As such, the Defendants' photographs did not suggest that they were the culprits. *See Funches,* 84 F.3d at 253; *McGowan,* 109 F.3d at 1174. Consequently, Defendants have failed to meet their burden of showing that the out-of-court, pho-

tographic identification procedure was so impermissibly suggestive that there is a substantial likelihood of misidentification.

Having determined that the Defendants have failed to meet their burden, the court need not determine whether the out-of-court, photographic identifications are sufficiently reliable, despite any potential suggestiveness. *See Moore,* 115 F.3d at 1360. Nevertheless, the court will analyze the reliability of Victims B and C's out-of-court, photographic identifications of the Defendants.

2. *Sufficiently Reliable*

■■■ In determining reliability, and the likelihood of misidentification, it is well established that courts should consider the five factors the Supreme Court set forth in *Biggers:* (1) the opportunity of the witnesses to view the crime and the actors; (2) the witnesses' degree of attention; (3) the accuracy of the witnesses' prior descriptions of the actors; (4) the witnesses' level of certainty at the time of the identification; and (5) the time elapsed between the crime and the identification. *See Brathwaite,* 432 U.S. at 114, 97 S.Ct. at 2253; *Biggers,* 409 U.S. at 199, 93 S.Ct. at 382; *Hall,* 109 F.3d at 1237–38.

Defendants argue that Victims B and C had little opportunity to view their captors, and that their attention was focused on other, unidentified captors. Defendants also argue that the victims initial descriptions of the Defendants were generic, and unhelpful. The Government argues, and the court agrees, that Victims B and C had sufficient opportunities to view their captors during their captivity, allowing them to form mental impressions for reliable identification.

First, with respect to the witnesses' opportunity to view the crime and the actors, Victims B and C will allegedly testify that the Defendants held them captive for nine and eight days, respectively. During their captivity, Victims B and C had several contacts with the Defendants. Defendants stood guard over Victims B and C; brought them food; took them to the bathroom; forced them to make ransom phone calls; and verbally and physically abused them. Allegedly, the captors only instructed Victims B and C to close their eyes during the relatively brief period of time between their abduction and arrival at the Newland House. Thus, Victims B and C had more than adequate opportunities to see their captors throughout their captivity. *See Brathwaite,* 432 U.S. at 114, 97 S.Ct. at 2253 (two to three minutes was sufficient opportunity to view the crime and the actors); *Biggers,* 409 U.S. at 200, 93 S.Ct. at 382–83 ("The victim spent a considerable period of time with her assailant, up to half an hour."); *United States v. Alexander,* No. 96–4179, 1997 WL 413513, at * 3 (7th Cir. July 16, 1997) (even if the witness' estimate of ten to twelve minutes is greatly overstated, she clearly had sufficient opportunity to view the robber).

Second, with respect to the witnesses' degree of attention, it is reasonable to assume that Victims B and C's undivided attention was focused on their captors. Victims B and C were held captive for over a week; thus, it is highly likely that they had nothing to do but examine their captors and their captors' actions. *See Biggers,* 409 U.S. at 200, 93 S.Ct. at 382–83 ("She was no casual observer, but rather the victim of one of the most personally humiliating of all crimes."); *Poole v. Godinez,* 12 F.3d 1101, 1993 WL 473670, at * 3 (7th Cir. Nov.17, 1993) ("[victim's] attention was expressly drawn to her assailant"); *Walton v. Lane,* 852 F.2d 268, 274 (7th Cir. 1988) ("the victim's degree of attentiveness must have been relatively high given that the perpetrator was alone with the victim, and that the victim's attention was focused on the robber").

Third, with respect to the accuracy of the witnesses' prior descriptions of the captors, both Victims B and C's prior descriptions fit the Defendants' physical characteristics. During their separate interviews, Victims B and C described the three captors not present during their escape (Varela, Torres, and Ruiz) as Mexican, males in their early 20's; Varela is 20 years old, Torres is 23 years old; and Ruiz is 19 years old. Defendants argue that this factor weighs in favor of finding that the out-of-court, photographic identifications are unreliable because Victims B and C's description of Varela, Torres, and Ruiz are too general. "Evidence teaches, however, that many persons may lack the ability to articulate a detailed description of a person they have seen and yet can still identify him on sight. Thus, the focus must be on inaccuracies rather than generality." *Israel v.*

*Odom,* 521 F.2d 1370, 1375 (7th Cir.1975). Significantly, there is no evidence or argument that Defendants do not fit Victim B and C's initial descriptions. *See United States v. Clark,* 989 F.2d 1490, 1496 (7th Cir.1993). As such, the court concludes that Victims B and C's initial descriptions accurately, although generally, depicted the Defendants, and supports that their later out-of-court, photographic identifications are reliable. *Id.*

With respect to the fourth and fifth factors, the Defendants practically admit that these factors weigh in favor of finding that the out-of-court, photographic identifications are reliable. Victims B and C, and Agents Slattery and Cassiday, will allegedly testify that Victims B and C unequivocally identified Varela, Torres, and Ruiz from the photo-array. Victims B and C identified the Defendants within hours of their escape, and a day after Defendants left the Newland House. *See Brathwaite,* 432 U.S. at 116, 97 S.Ct. at 2253–54 ("The photographic identification took place only two days later. We do not have here the passage of weeks or months between the crime and the viewing of the photograph."); *Hall,* 109 F.3d at 1238 ("only four days elapsed between the controlled buy and the identification at the photographic line-up.").

Consequently, even if the out-of-court identification procedure was impermissibly suggestive, the out-of-court, photographic identifications are admissible because they are sufficiently reliable under the totality of the circumstances. *See Brathwaite,* 432 U.S. at 114, 97 S.Ct. at 2253; *Biggers,* 409 U.S. at 199, 93 S.Ct. at 382; *Moore,* 115 F.3d at 1360; *Hall,* 109 F.3d at 1237–38.

### C. In-Court Identifications

■ Defendants also argue that Victims B and C should not be allowed to identify the Defendants in-court at trial because their out-of-court, photographic identifications would impermissibly taint their in-court identifications. The admissibility of in-court identifications following out-of-court identifications is governed by the same legal standard as the admissibility of out-of-court identifications. *See Biggers,* 409 U.S. at 198, 93 S.Ct. at 381–82; *United States v. Rutledge,* 40 F.3d 879, 889 (7th Cir.1994), *rev'd on other grounds, Rutledge v. United States,* 515 U.S. 1157, 115 S.Ct. 2608, 132 L.Ed.2d 852 (1995).

The central question is whether the out-of-court, "photographic identification procedure was so impermissibly suggestive as to give rise to a very substantial likelihood of irreparable misidentification." *Simmons,* 390 U.S. at 384, 88 S.Ct. at 971; *see also Hall,* 109 F.3d at 1238; *Rutledge,* 40 F.3d at 889. The court has found that it was not. As such, the court rejects Defendants' claims. *See Hall,* 109 F.3d at 1238 ("Having determined the identification to be reliable despite any suggestiveness, we must reject this claim [that the in-court identification was tainted by a suggestive line-up]."); *see also Rutledge,* 40 F.3d at 889 (since victim's identification was reliable, the district court properly admitted the victim's in-court identification of the defendant); *United States v. Duprey,* 895 F.2d 303, 308 (7th Cir.1989) (in-court identification is admissible even though the out-of-court, photographic line-up was unduly suggestive because there existed sufficient indicia of reliability).

### III. CONCLUSION

For the foregoing reasons, the court denies Defendants' Motion to Suppress Post–Arrest Photographic Identifications and Any Tainted Subsequent In–Court Identifications.

IT IS SO ORDERED.