**UNITED STATES of America,
Plaintiff–Appellee,**

v.

**Alan MASTERS, Michael J. Corbitt,
and James D. Keating,
Defendants–Appellants.**

**Nos. 89–2851, 89–2872 and 89–2873.**

United States Court of Appeals,
Seventh Circuit.

Argued Dec. 14, 1990.

Decided Feb. 6, 1991.

Rehearing Denied in No. 89–2872
March 28, 1991.

See also 879 F.2d 224.

Thomas Scorza, Barry R. Elden, Asst. U.S. Attys., Crim. Receiving, Appellate Div., Chicago, Ill., for U.S.

Patrick A. Tuite, Tuite & Associates, Chicago, Ill., for Alan Masters.

Jeffrey B. Steinback, Genson, Steinback & Gillespie, Chicago, Ill., for Michael J. Corbitt.

William P. Murphy, Murphy, Peters, Davis & O'Brien, Chicago, Ill., for James Keating.

Before BAUER, Chief Judge, and POSNER and KANNE, Circuit Judges.

POSNER, Circuit Judge.

Alan Masters and James Keating were charged in 1988 with, among other things, having "conduct[ed an] ... enterprise's affairs through a pattern of racketeering activity" in violation of 18 U.S.C. § 1962(c), and (along with Michael Corbitt) of having conspired to do so, in violation of § 1962(d); both are, of course, provisions of the RICO (Racketeer Influenced and Corrupt Organizations) statute. The statute provides that "enterprise" "includes any individual, partnership, corporation, association, or other legal entity, and any union or group of individuals associated in fact although not a legal entity." § 1961(4). The statutory term "pattern of racketeering activity" "requires at least two acts of racketeering activity," § 1961(5), defined as violations of various federal and state statutes. The jury found Masters and Keating guilty on both counts and Corbitt guilty on the conspiracy count—the only one he had been charged with, because the statute of limitations had expired on his substantive violations. The judge gave Masters and Keating consecutive prison sentences of 20 and 20, and 20 and 15, years, respectively, and Corbitt 20 years. The judge also fined Masters $250,000 on the conspiracy count and ordered all three defendants to forfeit criminal proceeds of $42,000. These are all pre-Sentencing Guidelines sentences. There were other counts in the indictment besides the two RICO counts, but the jury acquitted the defendants on those counts.

■ There is no challenge to the jury instructions, so we must construe the facts as favorably to the prosecution as the trial record and the jury verdict permit. The facts are a lurid mixture of corruption and murder in a west suburban Chicago set-

ting. Masters was a lawyer, Keating a lieutenant in the Cook County Sheriff's Police Department who commanded the vice squad and later the criminal investigative unit, and Corbitt the chief of police of Willow Springs. The RICO enterprise, as the government conceives it, was an informal association among the three defendants and three other entities (so a total of six in all): Masters' law firm (a professional corporation of which he was the sole shareholder and which employed another lawyer) and the two police departments. Between 1970 and June 1982, when Corbitt lost his job as chief of police of Willow Springs, Masters bribed Corbitt to refer persons arrested, ticketed, or investigated by the Willow Springs Police Department to Masters for legal assistance. Masters had similar kickback schemes with other police officers in the area. Keating entered the picture in 1972, two years after Corbitt. Between then and August 1984 Masters was the middleman in a scheme in which illegal bookmakers in Cicero, Illinois bribed Keating and officers under Keating's command to leave them alone.

In 1981 Masters discovered that his wife, Dianne, was having an affair. He asked a friend in the Cook County Sheriff's Police Department who would be in charge of any investigation arising out of events at Masters' home, and was disappointed when told that it would not be Keating. In January 1982 Dianne Masters hired a lawyer to file for a divorce. She let it be known that she hoped to obtain custody of her and Masters' four-year-old daughter. Masters hired a former police officer, Ted Nykaza, to install recording equipment in the Masters household for the purpose of eavesdropping on telephone conversations between Dianne and her paramour. Listening, with Nykaza and a Cook County Sheriff's Police sergeant, to one of the recorded conversations, Masters thought he heard Dianne and her paramour reminisce about the paramour's inserting a wine bottle into Dianne's vagina as part of their sex play. Masters exploded with anger and declared that he would have Dianne killed. Later he told a friend that he would ask Keating to kill her. Keating offered a former Cook

County Sheriff's Police officer $25,000 to kill Dianne on Masters' behalf, explaining that Corbitt was unwilling to do the killing himself but had agreed to dispose of the body.

Dianne Masters disappeared in the early morning of March 19, 1982. Her body was recovered from the trunk of her car nine months later when the car was discovered submerged in a canal near Willow Springs. She had been beaten and shot. Probably Corbitt had driven the car into the canal, though the jury's findings on this point are ambiguous. In the following months Keating used his position in the Cook County Sheriff's Police Department to obstruct the investigation of Dianne Masters' disappearance. Masters collected the proceeds of a $100,000 policy on Dianne's life. No one was ever charged with the murder.

The jury found that Masters had planned and solicited the murder of Dianne, that Keating had aided and abetted Masters' planning and solicitation, that Keating had obstructed the investigation, that (subject to our earlier qualification) Corbitt had sunk the car in the canal, and that all three defendants had agreed to conceal their actions relating to Dianne's murder indefinitely.

■ There is no question that the jury found, on sufficient and indeed abundant evidence, that defendants Masters and Keating committed, and all three defendants conspired to commit, two or more criminal acts that constitute "racketeering activity" within the meaning of the RICO statute. There were many distinct acts of bribery, criminal solicitation, and other crimes that come within the broad statutory definition of racketeering activity. The questions relate to the statutory requirements of "enterprise" and of "pattern." The alleged enterprise is an informal consortium of a law firm and two police departments with the three individuals who are the defendants. The defendants argue that a RICO enterprise, unless it is a legal entity such as an individual, a partnership, or a corporation, can only be a "union or group of *individuals*" (emphasis added), which Masters' law firm, the Wil-

low Springs Police Department, and the Cook County Sheriff's Police Department are not. The argument has repeatedly and we think correctly been rejected, illustrative decisions being *United States v. Feldman*, 853 F.2d 648, 655 (9th Cir.1988), and *United States v. Perholtz*, 842 F.2d 343, 352–53 (D.C.Cir.1988) (per curiam). The statute says " 'enterprise' includes"—not " 'enterprise' means." The point of the definition is to make clear that it need not be a formal enterprise; "associated in fact" will do. Surely if three individuals can constitute a RICO enterprise, as no one doubts, then the larger association that consists of them plus entities that they control can be a RICO enterprise too. Otherwise while three criminal gangs would each be a RICO enterprise, a loose-knit merger of the three, in which each retained its separate identity, would not be, because it would not be an association of individuals. That would make no sense.

■ The next question is whether the acts of this enterprise formed a pattern. That rarely is a problem with a criminal enterprise, as distinct from a lawful enterprise that commits occasional criminal acts. The business of a criminal enterprise is crime. The crimes form a pattern defined by the purposes of the enterprise. *United States v. Pungitore*, 910 F.2d 1084, 1104 (3d Cir.1990); *United States v. Angiulo*, 897 F.2d 1169, 1180 (1st Cir.1990); *United States v. Indelicato*, 865 F.2d 1370, 1383 (2d Cir.1989) (en banc) ("two racketeering acts that are not directly related to each other may nevertheless be related indirectly because each is related to the RICO enterprise"). The main purpose of the enterprise in this case was to bring under Masters' influence (for a price of course) the principal police agencies operating in his area of activity. He used this influence to obtain law business and to protect his clients. Like many a small businessman, legal and illegal, Ianni, A Family Business: Kinship and Social Control in Organized Crime 112, 127, 142 (1972), he did not make a rigid division between his business and his personal affairs. So when his wife's adultery and projected divorce brought

about a personal crisis that he believed could best be resolved through murder, it was natural for him to "hire" his own criminal enterprise to help with the job. If it could protect bookmakers, maybe it could protect a murderer.

A criminal enterprise is more, not less, dangerous if it is versatile, flexible, diverse in its objectives and capabilities. Versatility, flexibility, and diversity are not inconsistent with pattern. The systematic corruption of law enforcement in the west Chicago suburbs brought about by the Masters enterprise could be used for a variety of purposes without destroying the integrity, the rationale, of the enterprise. The acts of a criminal enterprise within the scope of the enterprise's evolving objectives form pattern enough to satisfy the requirements of the RICO statute.

The most difficult issue relating to enterprise and pattern in this case is whether the two are separate. If the "enterprise" is just a name for the crimes the defendants committed, or for their agreement to commit these crimes that was charged separately in the conspiracy count, then it would not be an enterprise within the meaning of the statute. *United States v. Turkette*, 452 U.S. 576, 583, 101 S.Ct. 2524, 2528–29, 69 L.Ed.2d 246 (1981); *United States v. Neapolitan*, 791 F.2d 489, 500 (7th Cir.1986). Otherwise two statutory elements—enterprise and pattern—would be collapsed into one. The jury was properly instructed, however, that it had to find that the informal enterprise consisting of the three defendants and the three organizations that they controlled or manipulated existed as an organization with a structure and goals separate from the predicate acts themselves, and we cannot say that the jury's finding that it had such existence was without rational support in the record. The strongest evidence is the handling of the problem of dealing with Dianne Masters. When that problem arose, a loose-knit but effective criminal organization was in place ready to respond effectively by planning and carrying out a detection-proof crime that would have been beyond the capacities of the individual defendants acting either singly or without the aid of their organizations.

Criminal enterprises have less structure than legal ones. For formal relationships created by contract and rule they substitute informal relationships based on kinship and friendship. Ianni, *supra*, at 154, 157, 172. It would be ironic if the RICO statute, aimed primarily at criminal enterprises such as the Mafia and its many petty imitators, was more effective against legal enterprises because the latter have a more perspicuous, articulated structure.

Despite the admitted elusiveness of the statutory terms, well illustrated by the preceding discussion, we do not agree with the defendants that, as applied to their activities, the statute is unconstitutionally vague. *United States v. Glecier*, 923 F.2d 496, 497 n. 1 (7th Cir.1991). Provided the statutes criminalizing the predicate acts are not unconstitutionally vague—and no one argues they are—the defendants are on adequate notice that they are committing crimes, and the fact that they may not be aware of the extent of their criminality and consequent exposure to punishment is a detail (the original conception of RICO as a sentence-enhancement provision is pertinent here). So at least *Fort Wayne Books, Inc. v. Indiana*, 489 U.S. 46, 58, 109 S.Ct. 916, 924, 103 L.Ed.2d 34 (1989), appears to hold, although a narrower reading is proposed in *United States v. Pungitore, supra*, 910 F.2d at 1103 n. 15. But forget *Fort Wayne Books* and the decision in this case must still be the same. The interpretive problems and resulting vagueness that afflict the RICO statute come from its application to lawful enterprises that commit occasional criminal acts. The miniature suburban mafia that the facts of this case disclose is within the statute's core.

The remaining issues raised by these appeals form a miscellany—not a pattern.

1. The issue of whether Judge Zagel should have recused himself under 28 U.S.C. § 455(a) because he was chief of the Illinois state police at the time it investigated (but failed to solve) Dianne Masters's murder was waived because not raised in an action for mandamus. *United States v. Troxell*, 887 F.2d 830, 833 (7th Cir.1989).

■ 2. The district judge did not commit reversible error in refusing to allow the defendants as part of their cross-examination of Ted Nykaza to inquire into his habit of wearing women's underwear. When Dianne Masters' body was found, it was missing its panties. At trial the defendants proposed that Nykaza had killed her because of his fetish for panties. This was hardly an impressive theory. Transvestites are not usually murderers. It is easy enough for them to buy articles of female clothing—they don't have to kill for it. In fact defense counsel were allowed to ask Nykaza about his fetish, and he acknowledged it. The judge was quite right to cut off further inquiry; the details of Nykaza's fetish would have been spicy, but peripheral to the issues because there was no suggestion that violence was an aspect of the fetish. Fed.R.Evid. 403. And if there was error here it was harmless, since it went to a charge—conspiracy to murder, as distinct from conspiracy to solicit and conceal—on which the defendants were acquitted.

■ 3. A more difficult issue is whether the statute's five-year statute of limitations bars the conspiracy charge against Corbitt, who lost his office as Willow Springs police chief in June 1982, six years before the indictment was handed down. We think not. Among the elements of the conspiracy with which Corbitt was charged was that he had agreed with the other two defendants "to conceal their actions involving the murder of Dianne Masters and ... to participate in such concealment indefinitely." The defendants do not deny that if there was such an agreement it was still in force five years before the indictment. The jury found that such an agreement existed and that Corbitt was a party to it, and the evidence supports these findings.

■ It is true that *Grunewald v. United States*, 353 U.S. 391, 77 S.Ct. 963, 1 L.Ed.2d 931 (1957), and earlier cases cited in it such as *Krulewitch v. United States*, 336 U.S. 440, 69 S.Ct. 716, 93 L.Ed. 790 (1949), hold that efforts to conceal a conspiracy are not automatically a part of the conspiracy. But we do not understand these cases to hold that a conspiracy can never include an agreement to conceal the defendants' conduct. The distinction is between the government's attempting to infer the existence of a conspiracy to conceal "from circumstantial evidence showing merely that the conspiracy was kept secret and that the conspirators took care to cover up their crime in order to escape detection and punishment," *Grunewald v. United States, supra*, 353 U.S. at 402, 77 S.Ct. at 972, and "an express original agreement among the conspirators to continue to act in concert in order to cover up, for their own self-protection, traces of the crime after its commission." *Id.* at 404, 77 S.Ct. at 974. The conspirators in this case, signally including Corbitt, intended from the first to exert strenuous efforts to prevent discovery of the crime and of their involvement in it; the fact that two of the three conspirators were policemen supports the inference that concealment was part of the original conspiracy and not a spontaneous reaction to fear of arrest and prosecution. It was also a fair inference that the defendants agreed to keep trying to conceal the conspiracy for as long as they could, using their official positions where possible. And there is no evidence that Corbitt, upon losing his position as chief of police of Willow Springs or at any other time, withdrew from the agreement. We must not forget that "withdrawal" is a term of art in the law of conspiracy. It is not enough that Corbitt ceased, "however definitively, to participate"; since he "did not communicate his abandonment to any of his co-conspirators and he did not make a clean breast to the authorities," he did not withdraw. *United States v. Patel*, 879 F.2d 292, 294 (7th Cir.1989). On the contrary, Corbitt hoped to get another chief's job in the western suburbs, the area of the conspiracy's operations, and there is no evidence of when, if ever, he ceased harboring such hopes.

4. But the very indefiniteness of the conspiracy's termination brings to the fore two serious issues with regard to sentencing.

a. The Sentencing Guidelines by their terms apply to crimes committed on or after November 1, 1987, and by interpretation to conspiracies that straddle this date. *United States v. Fazio*, 914 F.2d 950, 958–59 (7th Cir.1990), and cases cited there. The district judge made no finding as to when the conspiracy ended. If it ended after November 1, 1987, then he should have sentenced the defendants on count two (the conspiracy count) under the Guidelines. The case must be remanded for a determination of when the conspiracy ended, and for resentencing Masters and Keating on count two if the judge finds that the conspiracy indeed ended after the Guidelines took effect. (Corbitt does not challenge his sentence, and the government has not cross-appealed.)

For guidance on remand, we consider at the parties' request whether, if the judge resentences these defendants under the Guidelines, the new sentences should be "stacked" on top of the sentences on count one. The Sentencing Guidelines provide, in section 5G1.2(d), that sentences on separate counts shall be consecutive if necessary to reach the total length of sentence prescribed by the Guidelines, which may exceed the statutory maximum on each count. We believe that this provision, whose validity the defendants do not challenge, should govern the district judge in resentencing them on count two even though the sentence on count one is a pre-Guidelines sentence. For this is the procedure that will give maximum effect to the Guidelines within their intended domain, i.e., crimes committed after November 1, 1987.

b. There is an independent infirmity with regard to the $250,000 fine that the judge imposed on Masters, also under count two. The relevant provisions (18 U.S.C. §§ 3571, 3572, and Sentencing Guidelines § 5E1.2(d), if the conspiracy continued past November 1, 1987, and the repealed 18 U.S.C. §§ 3622, 3623 if it ended before) require the sentencing judge to consider a number of specified factors before imposing a fine, such as the burden on the defendant's family. 18 U.S.C. §§ 3622(a)(4) (repealed), 3572(a)(2). The judge made no findings with respect to any of these factors, and he must do so on remand before imposing a fine.

5. The jury ordered the defendants to forfeit $42,000 as "proceeds which the person [i.e., the defendant] obtained ... in violation of" the RICO statute. 18 U.S.C. § 1963(a)(3). This is joint and several liability, *Fleischhauer v. Feltner*, 879 F.2d 1290, 1301 (6th Cir.1989); *United States v. Caporale*, 806 F.2d 1487, 1506–09 (11th Cir.1986), meaning that $42,000 is the cap on the total amount that the government can collect but that subject to the ceiling each defendant is liable for the full amount. Masters and Keating argue that the government computed this figure (which the jury accepted) by adding up the amounts paid to Masters, in legal fees and bribes, by persons whom the criminal enterprise assisted, whether by fixing their cases or by protecting them from the law. Masters in particular argues that this amount must be an overestimate of the proceeds he obtained, since he forwarded some of the bribe money to his coconspirators and other police officers, and since some at least of the legal fees were not bribes at all but payment for lawful legal services.

In fact the government presented the jury with evidence that Masters had obtained at least $66,000 in fees and bribes from the persons whom the enterprise assisted. The government wanted the jury to find that about two-thirds represented bribes received by these defendants; and this was a reasonable estimate. The problem is that Masters did not keep all those bribes, yet he was made jointly and severally liable for the entire amount. Most but not all of the bribes that he passed on ended up in the pockets of his codefendants, but again they were found jointly and severally liable for the entire amount.

The statute is designed to force criminals to disgorge their ill-gotten gains. We may assume, therefore, as intimated in *Russello v. United States*, 464 U.S. 16, 22, 104 S.Ct. 296, 300, 78 L.Ed.2d 17 (1983), that the proceeds to which the statute re-

fers are net, not gross, revenues—profits, not sales, for only the former are gains. *United States v. Lizza Industries, Inc.,* 775 F.2d 492, 498 (2d Cir.1985), came out the other way and allowed the recovery of gross proceeds, but the court made no effort to square its reading with the language of the statute. Furthermore, the statute says that it is the proceeds received by the defendants, not by their enterprise, that are forfeitable.

But the jury was properly instructed on these issues, and $42,000 was a reasonable estimate of the total amount that the three defendants kept from the bribes that Masters received. The fact that Masters did not keep the whole amount is irrelevant given the jointness of each of the defendants' liability. Each is fully liable for the receipts of the other members of the enterprise, subject to the overall ceiling of $42,-000.

AFFIRMED IN PART, VACATED IN PART, AND REMANDED.