**UNITED STATES of America,**
**Plaintiff–Appellee,**

v.

**Miguel TORRES, Jose de la Paz Sanchez, Salome Varela and Jesus Ruiz,**
**Defendants–Appellants.**

**Nos. 98–1272, 98–1389, 98–1401, 98–3357.**

United States Court of Appeals,
Seventh Circuit.

Argued May 21, 1999.

Decided Sept. 15, 1999.

Rehearing and Rehearing En Banc
Denied Oct. 18, 1999.

R. Ryan Stoll (argued), Office of the United States Attorney, Chicago, IL, for Plaintiff–Appellee.

Steven Shobat (argued), Joseph R. Lopez, Chicago, IL, for Defendant–Appellant Torres.

Richard S. Kling, Chicago, IL, for Defendant–Appellant de la Paz Sanchez.

Steven Shobat (argued), Chicago, IL, for Defendant–Appellant Varela.

Keith Spielfogel, Chicago, IL, for Defendant–Appellant Ruiz.

Before FLAUM, KANNE and ROVNER, Circuit Judges.

KANNE, Circuit Judge.

This case arises from four kidnapings, one of which resulted in the death of a seventeen-year-old boy who had been abducted, shot and left unattended. All four victims were kidnapped because the kidnappers believed them to owe, or to be related to someone who owed, debts connected with cocaine trafficking.

A jury convicted the defendants, Miguel Torres, Salome Varela, Jesus Ruiz and Jose de la Paz Sanchez of various criminal charges arising from the string of hostage takings. Subsequently, the district court sentenced Torres, Varela and Ruiz to mandatory terms of life imprisonment and terms of forty-five years imprisonment to be served consecutively. It sentenced Sanchez to mandatory life imprisonment to be served consecutively with a term of twenty-five years. We have consolidated the defendants' appeals challenging their convictions and sentences.

## I. History

Torres, Varela, Ruiz and Sanchez (along with fugitive Luis Alberto Carreno) served as "enforcers" who carried out a kidnapping scheme to collect drug debts at the direction of persons in El Paso, Texas. During the month of June 1996, the group kidnapped four individuals. Each kidnapping occurred in roughly the same manner.

Members of the group used a blue and white Chevrolet van to abduct the victims. The group held three of the victims captive in the basement of a house located on Newland Avenue in Chicago. They confined the fatally wounded victim in a nearby apartment. Once they had abducted their victims, the group had one of their members or the victim call a relative of the victim demanding ransom.

Hostages Jesus Avila and Rafael Martinez, both drug dealers, and Jesus Flores, whose son owed a drug debt, were held at the Newland Avenue location. Avila was held for fifteen days, Flores for nine days and Martinez for eight days. The fourth victim, Jaime Estrada, was held in a nearby apartment for little more than a day and ultimately died as a result of a gunshot wound inflicted by Torres.

The kidnapping scheme began to unravel with the abduction of Estrada in Milwaukee. Upon returning to Chicago, the group called Estrada's brothers, demanding payment of $30,000. The Estrada family contacted law enforcement officials.

Following a number of recorded telephone calls between the group and the family, the FBI set up an undercover ransom delivery. They accompanied one of Estrada's brothers from Milwaukee to Chicago to pay the ransom. Estrada's brother left $30,000 in a suitcase in a locked car at a parking lot located at 44th and Pulaski and waited. Ruiz, Varela and Torres arrived at that location in a grey Chevrolet Lumina. Ruiz attempted to retrieve the money from the locked ransom car. As the FBI moved in on them, all three defendants fled. A high speed chase ensued, during which Varela pointed a gun at the agents. The chase ended when an agent struck the defendants' Lumina.

The FBI arrested Ruiz, Varela and Torres. Agents recovered a loaded .45 caliber magazine, loose .380 caliber ammunition, two pagers, a set of keys, a piece of cardboard with Estrada's brother's cell phone

number written on it, a loaded 9–millimeter magazine, identification for "Eduardo Molina," a telephone, a knife and night vision equipment. An agent found a 9–millimeter firearm along the path of the chase at a point where he had seen something fall along the street.

The next morning, Estrada was found at a used car lot on the west side of Chicago. Estrada died seventeen days later from his gunshot wound and the thirty-hour delay in treatment. After the arrests, the other three victims—Avila, Flores and Martinez—escaped from the house on Newland Avenue. None of the three had suffered serious physical injury.

Both the Chicago Police Department and the FBI searched the van, the apartment where Estrada had been held, and the house on Newland. From the van, they recovered two bullet-proof vests, blood that matched Estrada's DNA and fingerprints matching Varela, Sanchez and Torres. At the apartment, officers found ammunition, blood that matched Estrada's DNA, fibers linked to others found on Estrada, fibers linking the apartment to the house on Newland and fingerprints matching those of Varela, Torres, and Sanchez. From the house on Newland, they recovered handcuffs, an assault rifle subsequently identified as the gun used to shoot Estrada, ammunition, duct tape handcuffs, various documents linked to Sanchez, Torres and the van, fingerprints matching those of Torres, Varela, Ruiz and Sanchez, and keys to the van. Varela possessed the keys to the house on Newland when law enforcement officers arrested him.

Within a year after the arrest, the grand jury returned an indictment as to Torres, Varela, Ruiz and Sanchez. The subsequent superseding indictment charged Torres, Varela and Ruiz with conspiracy to commit racketeering, conspiracy to commit kidnapping, kidnapping in interstate commerce, three counts of using a firearm during and in relation to a crime of violence, assaulting a federal officer and four counts of violating the Hostage Act. The government indictment of Sanchez included identical charges with one fewer count of using a firearm during and in relation to a crime of violence. All four defendants appeal their convictions and sentences.

## II. Analysis

On appeal, Torres, Varela, Ruiz and Sanchez ("defendants") raise several issues. First, they argue that their convictions based on the RICO conspiracy charges should be set aside because the government failed to establish a pattern of racketeering and a RICO enterprise as defined by that statute. Second, they contend that the district court denied them their Sixth Amendment rights to an impartial jury by refusing to question prospective jurors during the voir dire about biases toward illegal Mexican aliens. Finally, they assert that the district court improperly denied them an evidentiary hearing regarding the admissibility of the identification testimony elicited during trial. The remaining issues raised by the defendants, including those pertaining to sentencing, do not merit discussion.

### A. The RICO Charges

The defendants assert that the government failed to allege legally and prove factually a RICO enterprise and a RICO pattern of racketeering. First, they contend that the indictment fails to meet the statutory requirements because the government did not describe the structure of the organization, the manner in which it was formed, the duration of the enterprise, the hierarchy or organization of the enterprise, or the decision-making process within the organization. They also charge that the indictment fails to meet the statutory requirements, because the government did not state the duration of the activities sufficiently to establish a pattern of racketeering. Second, even if the indictment were sufficient, the defendants claim the government did not offer proof of the enterprise separate from the pattern of racketeering. They also contend that the ac-

tivities occurred during a two-week period, which is not factually sufficient to establish a pattern of racketeering under RICO. We disagree and conclude that the indictment was sufficient to charge both a RICO enterprise and a pattern of racketeering and that the facts support finding that the defendants engaged in both.

### 1. The Indictment

■ We review contests to the sufficiency of an indictment *de novo. See United States v. Agostino*, 132 F.3d 1183, 1189 (7th Cir.1997), *cert. denied*, — U.S. ——, 118 S.Ct. 1526, 140 L.Ed.2d 677 (1998). To be sufficient, an indictment must state the elements of the crime charged, inform the defendant of the nature of the charges to enable her to prepare a defense and allow the defendant to plead acquittal or conviction so as to bar the possibility of future prosecutions for the same offense. *See* Fed.R.Crim.P. 7(c)(1); *Agostino*, 132 F.3d at 1189. "Generally, an indictment is sufficient when it sets forth the offense in the words of the statute itself, as long as those words expressly set forth all the elements necessary to constitute the offense intended to be punished." *United States v. Hinkle*, 637 F.2d 1154, 1157 (7th Cir.1981). We review indictments as a whole, rather than "in a hypertechnical manner." *United States v. McNeese*, 901 F.2d 585, 602 (7th Cir.1990).

■ The indictment of the defendants fulfills these requirements. The government charged the defendants under 18 U.S.C. § 1962, which states:

It shall be unlawful for any person employed by or associated with any enterprise engaged in, or the activities of which affect, interstate or foreign commerce, to conduct or participate, directly or indirectly, in the conduct of such enterprise's affairs through a pattern of racketeering activity or collection of unlawful debt.

18 U.S.C. § 1962(c). Thus, the indictment must charge that the defendants engaged in "(1) conduct (2) of an enterprise (3) through a pattern of racketeering activity." *See Sedima, S.P.R.L. v. Imrex Co.*, 473 U.S. 479, 496, 105 S.Ct. 3275, 87 L.Ed.2d 346 (1985).

■ The defendants first contend that the government did not establish the existence of a RICO enterprise. The superseding indictment, however, clearly alleges the existence of an enterprise. In relevant part, it states:

[The defendants] were an "enterprise" as that term is defined in Title 18, United States Code, Section 1961(4), namely a group of individuals who were associated in fact, which enterprise engaged in and the activities of which affected interstate and foreign commerce.... It was the purpose of the enterprise to obtain money and property, and to enforce the repayment of debts, through a course of kidnaping and intimidating individuals whom the defendants believed to owe, or whom they believed to be related to persons who owed, debts arising from the illegal trafficking of cocaine.

■ The statute defines "enterprise" as including "any individual, partnership, corporation, association, or other legal entity, and any union or group of individuals associated in fact although not a legal entity." 18 U.S.C. § 1961(4). It includes both legitimate and illegitimate, as well as formal and informal organizations. *See United States v. Turkette*, 452 U.S. 576, 587, 101 S.Ct. 2524, 69 L.Ed.2d 246 (1981); *Bachman v. Bear, Stearns & Co.*, 178 F.3d 930, 931 (7th Cir.1999). It must be "an organization with a structure and goals separate from the predicate acts themselves." *United States v. Masters*, 924 F.2d 1362, 1367 (7th Cir.1991). "A RICO enterprise is 'an ongoing structure of persons associated through time, joined in purpose, and organized in a manner amenable to hierarchical or consensual decision-making.'" *Richmond v. Nationwide Cassel L.P.*, 52 F.3d 640, 644 (7th Cir.1995) (quoting *Jennings v. Emry*, 910 F.2d 1434, 1440 (7th

Cir.1990)). "The continuity of an informal enterprise and the differentiation among roles can provide the requisite 'structure' to prove the elements of 'enterprise.'" *United States v. Rogers,* 89 F.3d 1326, 1337 (7th Cir.1996) (citation omitted).

The enterprise alleged in the indictment is comprised of Varela, Torres, Ruiz, Sanchez, Carreno and "others known and unknown to the Grand Jury." The enterprise existed as the enforcement arm of a cocaine trafficking operation. It sought to intimidate the debtors and their families by kidnapping. The indictment clearly spells out the means the defendants used to facilitate the enterprise, including the use of aliases and the possession of various items, such as firearms, ammunition, cell phones and pagers, to assist them in kidnapping and intimidating their victims. In addition, the indictment succinctly states the method employed by the defendants as part of the enterprise:

> After identifying a target, the defendants abducted the targeted victim and transported the victim in the Chevrolet conversion van to a residence used by the defendants for their criminal activities. The victim was then restrained and held captive in the selected residence. Relatives of the victim were then contacted to demand ransom in exchange for the victim's release.

The indictment also details how the defendants' enterprise continued through the separate kidnapping of four individuals who owed or were the relative of another who owed drug debts.

Upon examination, we believe the indictment sufficiently alleges the existence of a RICO enterprise. It follows the words of the statute itself and alleges an enterprise made up of the defendants. It provides structure to the enterprise by explaining who participated in it, what they did and its purpose, means, and methods. It is clearly an "association-in-fact," which is "a group of persons associated together for a common purpose of engaging in a course of conduct." *Turkette,* 452 U.S. at 583, 101

S.Ct. 2524. The defendants were associated to collect drug debts through a course of conduct including kidnapping, intimidation, and extortion. The allegations in the indictment go beyond simply a mere allegation of a group of people who get together to commit a pattern of racketeering. Therefore, the indictment sufficiently alleged a RICO enterprise.

■ The indictment also withstands scrutiny as to the pattern of racketeering element. The statute requires an allegation of "at least two acts of racketeering activity" within ten years. 18 U.S.C. § 1961(5). In addition, the indictment must allege that these predicate acts "are related and that they amount to or pose a threat of continued criminal activity." *H.J., Inc. v. Northwestern Bell Telephone Co.,* 492 U.S. 229, 239, 109 S.Ct. 2893, 106 L.Ed.2d 195 (1989). The indictment clearly alleges four predicate acts—the kidnapping of each victim, which occurred well within a ten year period. All four kidnappings happened during June 1996.

■ The defendants rest their challenge on a belief that the indictment does not sufficiently allege continuity. Specifically, the indictment, in relevant part, charges:

> [The defendants] and other persons known and unknown to the Grand Jury, being persons employed by and associated with the enterprise, which enterprise engaged in, and the activities of which affected, interstate and foreign commerce, unlawfully, willfully, and knowingly combined, conspired, confederated, and agreed together and with each other to violate Title 18, United States Code, Section 1962(c), that is, to conduct and participate, directly and indirectly, in the conduct of the affairs of the enterprise through a pattern of racketeering activity ... consisting of ... multiple acts of kidnaping ... multiple acts of extortion ... an act of felony murder....

Contrary to the defendants' assertions, an indictment·does not have to allege continu-

ity, which is not an element of the offense, with particularity. *See United States v. Palumbo Bros., Inc.*, 145 F.3d 850, 877 (7th Cir.1998), *cert. denied,* —— U.S. ——, 119 S.Ct. 375, 142 L.Ed.2d 310 (1998).

Even so, the facts substantiate the existence of continuity. As the Supreme Court noted, "[C]riminal conduct forms a pattern if it embraces criminal acts that have the same or similar purposes, results, participants, victims, or methods of commission, or otherwise are interrelated by distinguishing characteristics and are not isolated events." *H.J.*, 492 U.S. at 240, 109 S.Ct. 2893 (quoting 18 U.S.C. § 3575(e) and finding that Congress envisioned the same meaning with regard to its use of the term "pattern" in the RICO statute). In this case, the defendants in four separate instances engaged in similar conduct (kidnapping) for the same purpose (collecting drug debts) using the same methods. These acts were clearly not isolated events. They were part of a much larger plan that came to an end only upon the arrest of these participants. Thus, the indictment with regard to alleging a pattern of racketeering also withstands our review.

### 2. Sufficiency of the Evidence

■ Coupled with the defendants' challenges to the sufficiency of the indictment are their claims that the government did not factually prove the elements of a RICO enterprise and a pattern of racketeering. We review these claims regarding the factual sufficiency of the evidence with regard to both establishing the existence of an enterprise and a pattern of racketeering asking whether "after viewing the evidence in the light most favorable to the prosecution, *any* rational trier of fact could have found the essential elements of the crime beyond a reasonable doubt." *Agostino*, 132 F.3d at 1192 (quoting *Jackson v. Virginia*, 443 U.S. 307, 319, 99 S.Ct. 2781, 61 L.Ed.2d 560 (1979)). We will "overturn a verdict only if the record contains no evidence, regardless of how it is weighed, from which the jury could find guilt beyond a reasonable doubt." *Id.*

■ Sufficient evidence exists in the record to support the jury's finding of the existence of a RICO enterprise. To establish an enterprise, the government must show "evidence of an ongoing organization, formal or informal, and ... evidence that the various associates function as a continuing unit." *Turkette*, 452 U.S. at 583, 101 S.Ct. 2524. In this case, the government established that the defendants functioned as an informal organizational unit of a larger organization to enforce the collection of drug debts upon orders given to them by others in the organization in El Paso. Each surviving kidnap victim testified that the reason for his abduction was to obtain from the victim's family money to settle a drug debt he or one of his relatives owed. Sanchez testified that the defendants acted upon orders given by other associates in El Paso. The firearms, cell phones, pagers, ammunition, and other physical evidence located in the van and at the two hideouts support the allegations that the defendants were a well-equipped, sophisticated group engaged in criminal activities. This evidence clearly provides support for the jury's finding of the existence of an enterprise.

■ Sufficient evidence also supports a finding of a pattern of racketeering. The defendants' challenge focuses on the duration of the four predicate acts. They allege that the activities factually occurred during a two-week period of time, making it impossible to form a pattern. We disagree.

■ The government can show continuity by either referring to a closed period of repetitive conduct during a "substantial period of time" or to "past conduct that by its nature projects into the future with a threat of repetition." *H.J.*, 492 U.S. at 241–42, 109 S.Ct. 2893. In this case, the government appears to be relying upon the open concept. While the government would have to show duration to allege a

closed-ended continuity, the government to establish an open-ended continuity "may satisfy the continuity prong of the pattern requirement regardless of its brevity." *Vicom, Inc. v. Harbridge Merchant Services, Inc.*, 20 F.3d 771, 782 (7th Cir.1994). One way to establish this prong is by showing the existence of "a specific threat of repetition." *H.J.*, 492 U.S. at 242, 109 S.Ct. 2893. The government provided sufficient facts to meet this burden.

As other courts of appeals have noted, "in cases where the acts of the defendant or the enterprise were inherently unlawful, such as murder or obstruction of justice, and were in pursuit of inherently unlawful goals, such as narcotics trafficking or embezzlement, the courts generally have concluded that the requisite threat of continuity was adequately established by the nature of the activity, even though the period spanned by the racketeering activity was short." *United States v. Aulicino*, 44 F.3d 1102, 1111 (2d Cir.1995); *see also United States v. Busacca*, 936 F.2d 232, 238 (6th Cir.1991) (finding the government had established a pattern of racketeering from facts that demonstrated the defendant embezzled funds for only a two-and-one-half-month period because "[t]he manner in which the embezzlements occurred was capable of repetition indefinitely into the future, so long as there were either legal fees or other expenses [the defendant] wanted paid."); *United States v. Indelicato*, 865 F.2d 1370, 1385 (2d Cir.1989) (concluding that "nearly simultaneous murders of three persons as part of the conduct of the affairs of an organized crime enterprise constituted a 'pattern of racketeering activity' within the meaning of [RICO]"). We reached a similar conclusion in *United States v. O'Connor*, 910 F.2d 1466, 1468 (7th Cir.1990), holding that evidence of several acts of extortion during a two-month period that ended because of the defendant's arrest sufficiently formed a pattern of racketeering because the defendant "had committed himself to an enduring series of criminal acts, sufficient to establish a 'pattern'...."

We believe the acts of the defendants are similar to those presented in these cases. The manner in which they engaged in the kidnappings was capable of indefinite repetition so long as the others in El Paso ordered them to enforce the collection of outstanding drug debts. The equipment, firearms and other evidence found at the apartment and house, as well as the manner in which they performed the acts of kidnapping demonstrate that the defendants had also committed themselves to a series of criminal activities. The only reason their scheme ended was because they were caught. We will not reward them by precluding the government from establishing a RICO pattern because of the quick success of law enforcement officials. Our review clearly shows that the government presented sufficient facts to support the jury's findings of the existence of a pattern of racketeering.

Therefore, the indictment was sufficient to sustain the conviction, and sufficient facts exist in the record to support the jury's ultimate conviction.

## B. The Voir Dire

■ The second major challenge the defendants raise in regard to their conviction involves the manner in which the district court conducted the voir dire. The district court has "broad discretion in determining how best to conduct the *voir dire*." *United States v. Guy*, 924 F.2d 702, 708 (7th Cir.1991). We review its conduct for abuse of discretion only. *See United States v. Hasting*, 739 F.2d 1269, 1273 (7th Cir.1984).

The defendants believe the district court improperly refrained from asking questions of prospective jurors to determine if any juror harbored prejudice or bias against illegal Mexican aliens. While the district court declined to ask the specific questions suggested by the defendants, the transcript discloses that the court did ask

the following more general questions of all potential jurors:

As you look at the defendants who are seated immediately in front of you, can you say that you will be fair to them?

Can you be fair to each one of them?

Is there anything about them as you see them seated before you that would cause you to be unfair, biased or prejudiced against them in any way?

Have you ever traveled abroad?

Have you ever traveled to a foreign country?

Can you be fair to citizens of the United States as well as persons who are not citizens of the United States?

In your common experiences have you met citizens of other countries?

Do you have any biases or prejudices which would prevent you from being a fair and impartial juror?

The court also stated, "it is the objective of the Court to weed out any potential for discrimination in this case based upon national origin or any other factor." In asking the more general version of the bias questions, the court acknowledged to counsel that it was:

concerned about ... accentuating this issue.... [T]o emphasize this point [regarding illegal entry into the United States] might cause more problems than it would seek to preclude. It would be an overemphasis of a point or issue that goes to an element of one of the offenses.... And in this case to overemphasize the point of illegal entry in the jury selection process would be inappropriate. There is an alternative, and I have pursued the alternative; that is, to ask [the potential jurors] whether they can be fair to citizens and noncitizens as well.

The defendants maintain their objections on appeal, arguing that the more general questions could not get at the heart of the potential bias jurors may hold against illegal Mexican immigrants.

■ The voir dire provides the court with an opportunity to select impartial jurors and counsel with assistance in exercising peremptory challenges. *See Mu'Min v. Virginia*, 500 U.S. 415, 431, 111 S.Ct. 1899, 114 L.Ed.2d 493 (1991). The Supreme Court explained the voir dire in *Connors v. United States*, 158 U.S. 408, 413, 15 S.Ct. 951, 39 L.Ed. 1033 (1895):

[A] suitable inquiry is permissible in order to ascertain whether the juror has any bias, opinion, or prejudice that would affect or control the fair determination by him of the issues to be tried. That inquiry is conducted under the supervision of the court, and a great deal must, of necessity, be left to its sound discretion. This is the rule in civil cases, and the same rule must be applied in criminal cases.

While the Supreme Court has specifically required federal trial courts to question a venire about racial biases in cases involving interracial crimes of violence, *see Rosales–Lopez v. United States*, 451 U.S. 182, 192, 101 S.Ct. 1629, 68 L.Ed.2d 22 (1981), it has never prescribed a precise formula as to how that inquiry or any other in which the court attempts to assess the prejudice of potential jurors is to occur, *see Ham v. South Carolina*, 409 U.S. 524, 527, 93 S.Ct. 848, 35 L.Ed.2d 46 (1973).

■ The trial court has broad discretion as to how such inquiries should be conducted. *See Aldridge v. United States*, 283 U.S. 308, 310, 51 S.Ct. 470, 75 L.Ed. 1054 (1931). Federal Rule of Criminal Procedure 24(a) provides that a trial court may conduct the voir dire itself and supplement the examination with additional inquiries as it chooses. It may permit the parties to submit additional questions, which it must ask only "as it deems proper." *Id.* Contrary to the defendants' suggestion at oral argument, there is no constitutional right for counsel to conduct voir dire.

■ Within this structure, a defendant may request the court to ask certain questions of the venire. If the court with-

in its discretion, however, does not present these questions to the venire, this decision will result in reversible error "only where the circumstances of the case indicate that there is a reasonable possibility that racial or ethnic prejudice might have influenced the jury." *Rosales–Lopez*, 451 U.S. at 191, 101 S.Ct. 1629. Similarly, when a court refuses to ask the specific question offered by a party, but does inquire into the prejudice at some level, we have stated that this Court "will not find that a trial court abused its discretion in conducting voir dire where there is 'sufficient questioning to produce, in light of the factual situation involved in the particular trial, some basis for a reasonable knowledgeable exercise of the right of challenge.'" *Hasting*, 739 F.2d at 1273 (quoting *United States v. Martin*, 507 F.2d 428, 432 (7th Cir.1974) (quoting *United States v. Lewin*, 467 F.2d 1132, 1137 (7th Cir.1972))).

 This case does not involve interracial crimes—both the defendants and victims were Hispanic. Thus, the district court was not required to question the venire about racial biases under *Rosales–Lopez*. The record in this case reflects that while the district court did not accept the more specific questions presented to it by the defendants, it did ask the venire about potential prejudices arising from the defendants' status as non-citizens. Although the questions may not have been as specific as the defendants would have liked, we find them sufficient to elicit possible prejudice on the part of potential jurors. The court's inquiry was not merely perfunctory. It crafted several questions that attempted to balance the need to reveal prejudices on the part of potential jurors with the desire not to inject unnecessarily the issue of the illegal status of the defendants (which was also an element of the government's case) at this point in the proceedings. It did not ask only a single, general question of the venire to attempt to elicit bias—an approach we condemn, *see Lewin*, 467 F.2d 1132, 1138. Rather, it explored the matter with numer-

ous similar questions trying to gauge each potential juror's attitudes toward non-citizens. "Impartiality is not a technical conception. It is a state of mind." *United States v. McClinton*, 135 F.3d 1178, 1185 (7th Cir.1998), *cert. denied*, —— U.S. ——, 118 S.Ct. 2308, 141 L.Ed.2d 167 and *cert. denied sub nom., Kelley v. United States*, —— U.S. ——, 119 S.Ct. 197, 142 L.Ed.2d 161 (1998) (quoting *United States v. Wood*, 299 U.S. 123, 145, 57 S.Ct. 177, 81 L.Ed. 78 (1936)). The district court's approach recognized this reality and attempted to get at the potential juror's state of mind without unduly inserting bias into the voir dire itself. We recognize that this issue is a difficult one and that this balance is not an easy one to strike. Here, however, the district court's cautious approach did not deny defendants the ability to have a reasonable knowledge of the jurors so as to exercise their peremptory challenges and, thus, does not amount to an abuse of its discretion.

## C. A Pre-trial Evidentiary Hearing

The final challenge raised by the defendants that we consider involves the district court's decision to deny their request for a pre-trial evidentiary hearing regarding the out-of-court identifications by two of the victims. The defendants claim that the court should have provided them with a hearing before it decided to permit the introduction of the out-of-court identifications of Varela, Torres, Sanchez and Ruiz by victims Martinez and Flores. The defendants maintain these identifications were unduly suggestive because of the manner in which law enforcement officials obtained them. They assert that they presented sufficient evidence to show that the photo array used to obtain the identifications was unduly suggestive and increased the likelihood of mistaken identification. This challenge, however, amounts only to a contest of the district court's denial of the hearing, not the constitutionality of the photo array.

██ Whether or not to conduct a pre-trial evidentiary hearing to assess the admissibility of an identification is within the judgment of the district court and, thus, subject to deferential review. *See United States v. Bolton*, 977 F.2d 1196, 1201 (7th Cir.1992); *cf. United States v. Rodriguez*, 69 F.3d 136, 140 (7th Cir.1995) (concluding that the Court should review a denial of an evidentiary hearing to determine whether an encounter with law enforcement amounted to a "seizure" under a clearly erroneous standard because of the factually specific nature of the inquiry); *United States v. Rollins*, 862 F.2d 1282, 1291 (7th Cir.1988) (stating that a district court has discretion whether or not to hold an evidentiary hearing regarding a motion to suppress). The Supreme Court has clearly stated that the U.S. Constitution does not contemplate a *per se* rule mandating a judicial determination as to the admissibility of identification evidence outside the presence of the jury in every case. *See Watkins v. Sowders*, 449 U.S. 341, 349, 101 S.Ct. 654, 66 L.Ed.2d 549 (1981). In fact, it is often properly left to the jury to determine the reliability of identification evidence. *See United States v. Johnson*, 859 F.2d 1289, 1296 (7th Cir.1988).

██ This Court has outlined a rather straightforward test to evaluate whether a district court has erred by denying a defendant a pre-trial evidentiary hearing. To successfully argue that a district court improperly denied her a pretrial evidentiary hearing, a defendant must demonstrate that the parties disputed material issues of fact. *See Rollins*, 862 F.2d at 1291 (citing *Nechy v. United States*, 665 F.2d 775, 776 (7th Cir.1981)). This burden may only be met by the defendant showing "definite, specific, detailed, and nonconjectural"

facts. *See Rodriguez*, 69 F.3d at 141 (citations omitted). When evaluating the district court's decision under this test, we review its "exercise of discretion based upon the state of the record at the time the motion was made." *See Rollins*, 862 F.2d at 1289 (citation omitted).

██ In considering the defendants' request for a pre-trial hearing on this subject, the district court concluded that the defendants failed to present "definite, specific, detailed, and nonconjectural" facts to support their contention that the court must provide them with a hearing. The court stated: "Defendants merely argue that an evidentiary hearing is required so that they can have an opportunity to cross-examine identification witnesses to determine what transpired during the out-of-court photographic identifications." *United States v. Varela*, 976 F.Supp. 1144, 1147 (N.D.Ill.1997). The district court then, correctly, noted that the cross-examination desired by the defendants could be obtained without a pre-trial evidentiary hearing and that the Supreme Court in *Watkins*, 449 U.S. at 348–49, 101 S.Ct. 654, had concluded that cross-examination during trial was a sufficient vehicle for the defendants to cast doubt upon the reliability of the identifications. The court declined to grant the defendants' request for a pre-trial evidentiary hearing and concluded that the out-of-court identifications were admissible in a published opinion. *See Varela*, 976 F.Supp. at 1147.

Our examination of the defendants' motions[1] reveals that while the defendants argued for a hearing, they did not provide any specific facts that were in dispute. In fact, defendant Varela appears to have been under the mistaken belief that the government bore the burden as to showing

---

1. Only defendants Varela and Ruiz designated their motions to suppress the out-of-court identifications as part of the record on appeal. The district court's docket sheet indicates that Torres also filed a similar motion. He did not, however, designate it as part of the appellate record. As for Sanchez, it appears from the docket sheet that he did not file a

separate motion on this topic, nor did he designate one in his appellate record. The district court (perhaps pursuant to Sanchez's request that all relevant motions made by his co-defendants be applied to him as well), however, appears to have considered the request for a pre-trial evidentiary hearing with regard to all four defendants.

issues of material fact as to this matter. He argued: "Should the government contravene any factual assertion or inference drawn in this motion in its response, an evidentiary hearing at which witnesses may be cross examined must be held to permit this Court to determine what transpired during the identifications." It is a defendant's burden to establish these differences, not the government's.

As best as we can ascertain from the motions in the appellate record, the differences between the defendants' motions and the government's responses rest solely on the characterization of the facts and the conclusions drawn from them. For example, the defendants argued in their motion that the victim-witnesses had little opportunity to view their captors. This statement is based on mere speculation because neither party disputes the fact that captors held the victim-witnesses for eight and nine days respectively. In addition, the defendants speculate that law enforcement officials told the victim-witnesses that suspects were being held in connection with the kidnappings before showing them the photo array in which the three suspects stood behind FBI placards. They present nothing to support this assertion. Finally, with regard to Ruiz's motion, the government in its response asserts that Ruiz misunderstood the police report and that the government and Ruiz's counsel were working to alleviate the problems. No further mention is made in regard to this problem, but it clearly does not amount to a disputed issue of material fact mandating the district court to hold a hearing. Thus, the defendants failed to provide a sufficient factual basis for its request of a pre-trial evidentiary hearing on this matter.

On appeal, the defendants take exception to several of the facts proffered by the government in its responses to these motions, claiming that the government failed to provide factual support for its statements. They assert that subsequent testimony during the trial showed these statements to be false. In reviewing the district court's decision, we consider the facts to which the district court was privy at the time of its ruling. We do not serve as Monday morning quarterbacks second-guessing the district court with information unavailable to it at the time it made its decision. Thus, these subsequent contentions are irrelevant to our review. Therefore, based on the information before the district court at the time it made its decision, we cannot conclude that the district court erroneously denied the defendants' request for a pre-trial evidentiary hearing.

## III. Conclusion

We find no reason to grant the defendants' request for a reversal of their convictions. The government sufficiently alleged both a RICO enterprise and pattern of racketeering in the indictment and presented sufficient evidence to prove these allegations during trial. In addition, the district court did not abuse its discretion when it attempted to refrain from injecting bias into the trial while balancing the defendants' need to obtain information about the attitudes of venire members toward non-citizens. Finally, the district court's decision to deny the defendants a pre-trial evidentiary hearing in regard to the out-of-court identifications was not erroneous. Thus, we AFFIRM the conviction and sentence of each defendant.

ILANA DIAMOND ROVNER, Circuit Judge, concurring.

I join the court's opinion but write separately to voice reservations concerning the voir dire of prospective jurors. In view of the fact that the charged violations of the Hostage Act required the government to prove that the defendants were not nationals of the United States, 18 U.S.C. § 1203(b)(2), (c), the district court was obliged to conduct (or permit) at least some inquiry designed to ferret out potential bias against non-nationals. I view the questions posed as to the jurors' exposure to citizens of other countries, and their

ability to be fair to those who are not citizens of this country, as adequate (but barely so) in that regard. I also agree with my colleagues that the circumstances of this particular case did not demand additional inquiry aimed at exposing bias related to the defendants' race, nationality, and undocumented status. Although the defendants' illegal presence in this country was disclosed to a limited extent, I am satisfied that neither their status, their nationality, nor their race was so highlighted as to compel additional voir dire along those lines. Further inquiry would have been prudent, a point evidenced by the fact that the government as well as the defense proposed voir dire questions in these areas; but in the final analysis I do not believe that the failure to engage in that inquiry amounts to reversible error.

Were a more searching exploration of bias motivated by race, nationality, or illegal status required, I would be forced to conclude that the voir dire in this case was inadequate. Here, the district court refused to pose any question that would have confronted such prejudices head-on. Like my colleagues, I appreciate the delicate nature of the undertaking and the reluctance to pose questions that inevitably will highlight the very characteristics that may inspire animus in a prospective juror. Ante at 810–11; *but see Rosales–Lopez v. United States*, 451 U.S. 182, 191, 101 S.Ct. 1629, 1636, 68 L.Ed.2d 22 (1981) (plurality) ("In our judgment, it is usually best to allow the defendant to resolve this conflict by making the determination of whether or not he would prefer to have the inquiry into racial or ethnic prejudice pursued."). Yet, once the court decides that inquiry is appropriate, it must ask questions that supply the parties and their counsel with meaningful information. *See Morgan v. Illinois*, 504 U.S. 719, 729, 112 S.Ct. 2222, 2230, 119 L.Ed.2d 492 (1992); *United States v. Guy*, 924 F.2d 702, 707 (7th Cir. 1991). Asking a juror whether she has "any" bias or prejudice that would prevent her from being fair, or whether there is "anything" about the defendants "as you see them" that might cause her to be biased, is simply not enough. *See Art Press, Ltd. v. Western Printing Mach. Co.*, 791 F.2d 616, 618–19 (7th Cir.1986). Members of the venire cannot be expected to divine what attitudes and animosities the court and the parties want to know about. Asked whether she "sees" anything that would cause her to be prejudiced, a prospective juror might focus on the defendant's clothes, his jewelry, his weight, his apparent comb-over—anything but his race. If voir dire is to yield helpful information, the questions themselves must be framed so as to elicit concrete, candid responses, *see United States v. Jones*, 188 F.3d 773 (7th Cir.1999), and these were not.