NONPRECEDENTIAL DISPOSITION
To be cited only in accordance with
Fed. R. App. P. 32.1

# United States Court of Appeals

**For the Seventh Circuit**
**Chicago, Illinois 60604**

Argued February 29, 2008
Decided May 13, 2008

**Before**

RICHARD A. POSNER, *Circuit Judge*

ILANA DIAMOND ROVNER, *Circuit Judge*

TERENCE T. EVANS, *Circuit Judge*

No. 07-1486

UNITED STATES OF AMERICA,
        *Plaintiff-Appellee*,

    *v.*

ANTHONY C. MORDI,
        *Defendant-Appellant*.

Appeal from the United States District
Court for the Northern District of
Illinois, Eastern Division.

No. 05 CR 511

Elaine E. Bucklo, *Judge*.

**O R D E R**

Anthony Mordi, who paid couriers to smuggle drugs to the United States from
his native Nigeria, appeals his convictions for conspiring to import and to possess
heroin. He argues that the district court's voir dire was inadequate to test the potential
jurors' biases or their understanding of key legal concepts. He also argues that the
government's late disclosure of certain pieces of evidence prevented him from
preparing an adequate defense and thus violated his right to a fair trial.

The chain of events that led to Mordi's problems with law enforcement began when federal agents arrested a fellow named Ayo Adeyemi. Among the many items of contraband found in Adeyemi's apartment, the agents discovered travel documents bearing the names of Godwin and Hadijat Ogundipe, who the agents believed had smuggled drugs into the United States for Adeyemi. Suspecting that the Ogundipes would smuggle drugs again, the agents flagged their names in a database maintained by Immigration and Customs Enforcement. As a result, the next time the Ogundipes tried to enter the United States, border agents at the Newark airport subjected them to extra scrutiny and discovered some 1,500 grams of heroin hidden in three places: in Mrs. Ogundipe's purse and shoes, and in the couple's suitcase.

The Ogundipes told the agents that they were transporting the heroin to Mordi in Chicago. They agreed to cooperate and allowed the agents to record several phone conversations between Mr. Ogundipe and Mordi. In those calls, Mr. Ogundipe told Mordi that the couple was having trouble getting seats on a flight from Newark to Chicago, they discussed payment for "that thing," and Mordi explained, "I need that thing today." (At trial, Mordi testified that he was not referring to heroin, but to a cache of video compact discs that he hoped to resell at a profit.) Eventually, Mr. Ogundipe told Mordi that the couple would be on the first flight the next morning and Mordi agreed to wire him money to pay for a hotel room. The agents took Mr. Ogundipe to pick up the $260 that Mordi had sent and then they took him to the Econo Lodge where Mordi had suggested he stay (it was a few dollars cheaper than the Ramada that Mr. Ogundipe favored). To keep up appearances, the agents had Mr. Ogundipe check into the hotel and call Mordi from a hotel room, but they did not allow him to stay the night. Instead, the couple spent the night in custody at the airport. The next morning, two agents accompanied the Ogundipes on a flight to Chicago. On Mordi's instructions they took a taxi--it was a real taxi, but the driver was an undercover agent--to an apartment on Chicago's far-north side, where agents arrested Mordi.

Mordi and the Ogundipes were indicted for conspiracy to import a controlled substance with intent to distribute, 21 U.S.C. §§ 963, 952(a), and Mordi alone was indicted for conspiracy to possess a controlled substance with intent to distribute, *id.* §§ 846, 841(a)(1). Mordi pleaded not guilty to both counts. Five days before his trial was scheduled to begin, the Ogundipes pleaded guilty and agreed to testify against him. The government provided Mordi with information about the Ogundipes' expected testimony, but on the day of trial, Mordi argued that the information and other evidence the government disclosed came so late that he did not have enough time

to adequately review and consider it. On Mordi's motion, the district court granted a continuance and trial did not begin until a month later. More evidence was produced within days of the actual start of trial, but we will get to that later. Trial lasted five days, the jury convicted Mordi on both counts, and he was sentenced to 188 months.

Mordi's first challenge on appeal concerns the jury selection process. As is typical in federal court, the judge (Elaine Bucklo) conducted voir dire by asking questions of the 40 potential jurors. Mordi had submitted a 14-page list of 115 questions he wanted Judge Bucklo to pose to the potential jurors. Unsurprisingly, she did not ask all of them. She began the voir dire by asking each juror to give a brief biographical sketch including things like name, place of employment, previous jury service, and reading preferences. Next she asked 14 general yes-or-no questions to the entire venire, which we paraphrase:

1. Do you know anyone involved in the case, either those people seated at counsel tables, those who will testify, or those who may be named in testimony?
2. Have you ever been a party in a civil case?
3. Have you ever been a witness in a civil or criminal case?
4. Have you or anyone close to you been arrested or charged with a crime?
5. Do you have any relatives or friends who work in law enforcement?
6. Would you be unable to follow the court's direction that testimony of law enforcement officials is neither more nor less credible than testimony of other witnesses?
7. Do you have any bumper stickers on your car?
8. Has anyone close to you been treated for problems with drugs?
9. Is there anything in general about the nature of the offense charged that would prevent you from being fair and impartial to either side?
10. Would you have trouble presuming that Mordi is innocent?
11. Would you have trouble drawing no inference from Mordi's decision to exercise his right not to testify?
12. Would you have trouble avoiding any consideration of Mordi's Nigerian ethnicity in reaching a verdict?
13. Would you have trouble following the law as the court instructs?
14. Do you hold any religious, moral, or ethical beliefs that would make it difficult for you to sit in judgment of another person?

After each question, Judge Bucklo noted the names of the jurors who raised their hands to answer yes. When she had asked all 14 questions, Judge Bucklo went through the list of jurors who had given yes answers and subjected those jurors to follow-up questions either in open court or at a sidebar with the lawyers for each side present. More than half of the 40 potential jurors were questioned separately at sidebar and 6 were excused for cause. In a number of sidebars, Judge Bucklo allowed the lawyers to pose their own questions of the potential juror. After all sidebars were completed, Judge Bucklo asked the parties, "Is there anything anybody else thinks I need to ask anyone else?" After neither party had any suggestions, Judge Bucklo asked a final question of the jurors: "Is there anybody sitting here who thinks that there's something that they are thinking about that could bear on their ability to be a fair and impartial juror that we haven't discussed?" Mordi asked the judge to excuse two nonnative English speakers for cause, but she refused. Then the two sides exercised their peremptory strikes and Judge Bucklo seated the jury. She asked if both sides were satisfied with the jury and both said they were.

Mordi argues that the voir dire was defective because the court failed to question jurors individually, and in sufficient depth, about their understanding of key legal concepts or about biases they might harbor against Nigerians. Because Mordi failed to object to the jury composition or to suggest more questions when given the opportunity to do so, our review is for plain error only. *See United States v. Lott*, 442 F.3d 981, 984 (7th Cir. 2006). But Mordi cannot even make it past the first prong of the familiar plain-error test, *see id.*, because there was no error at all. A district court has broad discretion over how to conduct voir dire; we will not reverse when there was "sufficient questioning to produce, in light of the factual situation involved in the particular trial, some basis for a reasonably knowledgeable exercise of the right of challenge." *United States v. Torres*, 191 F.3d 799, 810 (7th Cir. 1999) (quoting *United States v. Hasting*, 739 F.2d 1269, 1273 (7th Cir.1984)).

Under Federal Rule of Criminal Procedure 24(a), the court may conduct the voir dire on its own or allow the attorneys to question the jurors themselves. If the court examines the jurors, as it did here, it must allow the attorneys to ask further questions themselves or submit question "that the court may ask if it considers them proper." FED. R. CRIM. P. 24(a)(2). Mordi submitted a list of questions but, as we explained, that list was extremely long, so it is hardly surprising that Judge Bucklo chose not to ask each one. Instead, she properly exercised her discretion to ask only the questions she

deemed appropriate. *See, e.g., Gardner v. Barnett*, 199 F.3d 915, 920-21 (7th Cir. 1999) (no right to have particular question asked in voir dire).

Mordi's first specific complaint about the voir dire--that Judge Bucklo did not ask enough questions on the potential jurors' understanding of legal concepts--is without merit. Our summary of the voir dire shows that Judge Bucklo inquired sufficiently into the level of the potential jurors' understanding of important legal concepts and their ability to follow her directions. Mordi wishes that Judge Bucklo had questioned each juror individually rather than as a group, but there is no such requirement. *See, e.g., Hasting*, 739 F.2d at 1272. A judge need not administer a civics exam to each juror; she needed only assure herself and the parties that the jurors will follow her directions. Judge Bucklo's questions regarding the jurors' understanding of legal concepts and their ability to follow directions were sufficient because they provided Mordi with enough information upon which to exercise his challenges. *Torres*, 191 F.3d at 810. But even if the voir dire had been infected by error, Mordi's failure to provide any evidence to show that the jury was anything but impartial would render such error harmless. *See United States v. Mendoza*, 510 F.3d 749, 754 (7th Cir. 2007).

Mordi's complaints about questioning for bias fail as well. Buried in his lengthy voir dire submission were the following suggested questions on race and ethnicity:

> 103. The evidence will show that Anthony Mordi is from Nigeria.
> 104. Have any of you ever met anyone from Nigeria? Have you ever had any contact with someone from Nigeria? What was it? How does that affect how you view all Nigerians?
> 105. Will Anthony Mordi's race and ethnicity play any role in your decision? Will his race and ethnicity prevent you from presuming him innocent?

These questions do go further in depth than those Judge Bucklo actually asked: "Mr. Mordi is from Nigeria. Do you understand that his race and ethnicity cannot play any role in your decision? Is there anybody who could not follow that rule?" But Judge Bucklo's questions went far enough. Mordi is wrong to argue that Judge Bucklo's questions were the equivalent of refusing the parties any input in the questioning of the jurors and asking only, "Is there any reason you cannot fairly and impartially try this case?" *See United States v. Lewin,* 467 F.2d 1132, 1138 (7th Cir. 1972). By contrast, Judge Bucklo's questions were specific enough to elicit any possible prejudice. *See Torres*, 191

F.3d at 810. She was certainly within her rights to refuse Mordi's extra questions and avoid "unduly inserting bias into the voir dire itself." *Id*.

Mordi's only other argument is that the government's disclosure of certain discovery materials came so late that he did not have sufficient time to prepare an adequate defense and, consequently, his right to a fair trial was violated. Although Mordi complains mightily about material disclosed shortly before the original trial date, he cannot plausibly argue that those disclosures hindered his trial preparation because the district court gave him a one-month continuance. Mordi's only valid complaint lies with material he received close in time to the actual date on which the trial began, and he presents a developed argument about only one such item: records of money he transferred by Western Union. But Mordi cannot possibly show that the timing of the government's disclosure of this evidence prejudiced him. *See United States v. Smith*, 502 F.3d 680, 689-90 (7th Cir. 2007) (late disclosure under Federal Rule of Criminal Procedure 16 not reversible error absent prejudice); *United States v. Warren*, 454 F.3d 752, 760 (7th Cir. 2006) (late disclosure of *Brady* evidence not reversible error absent prejudice). Mordi argues that given more time with the Western Union records he could have used the records showing transfers originating in London to call into question the accuracy of the other records because he has never been to London. But even putting aside all the other evidence on which the jury could have relied, this strategy could not possibly have succeeded for a very simple reason: on the witness stand, Mordi confirmed the accuracy of the records he now says he could have called into doubt. Even assuming that the timing of the government's disclosure violated Federal Rule of Criminal Procedure 16 or *Brady v. Maryland*, 373 U.S. 83 (1963), Mordi was not prejudiced by it.

Accordingly, we AFFIRM the judgment of the district court.